INTERNATIONAL NAVIGATORS
COUNCIL OF AMERICA,
Petitioner,

v.

John H. SHAFFER, Administrator of the
Federal Aviation Administration,
Respondent,
American Airlines et al., Intervenors.

No. 24302.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 9, 1970.

Decided April 14, 1971.

Mr. Herbert A. Levy, Washington, D. C., for petitioner.

Messrs. Richard R. Kasher, Washington, D. C., and Angelo V. Arcadipane also entered appearances for petitioner.

Miss Judith S. Seplowitz, Atty., Department of Justice, with whom Mr. Alan S. Rosenthal, Atty., Department of Justice, was on the brief, for respondent. Messrs. Morton Hollander and Robert E. Kopp, Attys., Department of Justice, also entered appearances for respondent.

Mr. Edmund E. Harvey, Washington, D. C., with whom Mr. Roy Nerenberg, Washington, D. C., was on the brief, for intervenors.

Before McGOWAN, MacKINNON and ROBB, Circuit Judges.

McGOWAN, Circuit Judge:

This statutory review proceeding involves a challenge to the methods by which the respondent Federal Aviation

Administrator has been authorizing the use of certain newly-developed navigational equipment by commercial air carriers in overseas service. Petitioner, International Navigators Council of America (INCA), is a nonprofit association comprised of navigators employed by air carriers. Its stated purpose is to assure "the establishment of and adherence to the highest possible standards of accuracy and reliability in airline navigation, in the interest of safety * * *." The intervenor airlines have each been granted by respondent the authority to employ the navigational equipment in question. We are confronted with a threshold claim that we are without jurisdiction to entertain this petition, since it assertedly relates to an action by respondent not embraced within the direct review by this court contemplated by the Congress. For the reasons hereinafter set forth, this jurisdictional barrier is, in our view, insurmountable.

## I

In transoceanic air flight a carrier must rely on its navigational appliances to preserve the necessary separation from other airborne traffic and to maintain the aircraft in its designated corridor. Through its statutorily authorized rulemaking procedures, the FAA has established at various times in recent years minimum standards with respect to several distinct types of navigational equipment which a carrier may elect to utilize. Two such formally established systems rely on feedback signals from ground-based sources (14 C.F.R. §§ 37.-165, 37.171 (1970)), while others operate on principles of celestial sightings, or on the measurement of wind and jet stream pressure, or on signals reflected from the ocean surface (14 C.F.R. §§ 37.170, 37.173 (1970)). Carriers have broad latitude in the employment of navigational equipment from among these various types, and there is apparently no uniformity among carriers in the appliances they adopt.[1]

The development of navigational tools has not been a static art. In 1968 the FAA began approving, on an application-by-application basis, the installation of a more recently conceived self-contained system known as INS (Inertial Navigation System). This equipment is unique in that it is not dependent on information derived from ground-based sources or upon other exterior aids. Although it is not entirely clear on the basis of the papers before us, it appears that INS is also unique in that it permits cockpit navigation by the pilot, thus obviating the need for a qualified navigator.[2]

The application procedure to be followed by carriers desiring to implement INS was set out in FAA Advisory Circular No. 121–13, dated October 14, 1969. This Circular outlines the showing required for FAA approval, including, among other things, demonstrations of "sufficient experience * * * to establish * * * the accuracy and reliability of the system," an explanation of the training program adopted for pilots and crew members, a description of the periodic inspection and maintenance procedures to be followed, and a demonstration of the pilots' proficiency with this form of cockpit navigation. Pursuant to authorizations granted under this Circular, INS is being utilized presently on some transoceanic flights, including apparently all such flights by the large Boeing 747 aircraft.[3]

1. Heretofore most carriers have employed complementary navigational systems in prudential reliance on the redundancy of equipment to guard against malfunctioning and to provide a constant cross-check of the accuracy of the flight path.

2. See 35 Fed.Reg. 12479 (1970). INCA has alleged in its reply brief that the FAA and intervenors have intimated to this court "that INCA's purpose here is not to protect airline safety, but rather to preserve navigator jobs." Since INCA plainly has a legitimate interest in the safety of air transportation, we have not concerned ourselves with any subsidiary purpose, if indeed there be such.

3. Once approved, the Circular allows INS to be used as the sole means of navigation without the necessity of maintaining a complementary backup system relying

On February 25, 1970, petitioner filed a complaint with the Administrator pursuant to Section 1002 of the Federal Aviation Act, 49 U.S.C. § 1482(a) (1964).[4] The complaint characterized as a threat to air safety respondent's failure to promulgate rules or regulations establishing minimum standards for INS. INCA's essential allegations were that the Administrator was statutorily obligated to promulgate standards similar to those governing other navigational appliances, and that, in failing to do so, he was engaged in a course of conduct violative of Section 601 of the Act, 49 U.S.C. § 1421.[5] The advisory circular procedure was condemned as an invalid alternative to formal rulemaking, since the circulars are published only for the purpose of providing "nonregulatory guidance and informational material to the public." [6] The complaint requested the Administrator to enter a four-part order embodying the following relief:

(1) The initiation and completion of rulemaking proceedings under

on any of the alternative navigational systems. See Note 1 *supra.* Cross-checks are provided, however, by a requirement that each authorized carrier install at least two identical sets of INS equipment. As an added safety precaution, such units have been installed in triplicate in all 747's.

4. Section 1002 in relevant part is as follows:

(a) Any person may file with the Administrator or the Board, as to matters within their respective jurisdictions, a complaint in writing with respect to anything done or omitted to be done by any person in contravention of any provisions of this chapter, or of any requirement established pursuant thereto. If the person complained against shall not satisfy the complaint and there shall appear to be any reasonable ground for investigating the complaint, it shall be the duty of the Administrator or the Board to investigate the matters complained of. Whenever the Administrator or the Board is of the opinion that any complaint does not state facts which warrant an investigation or action, such complaint may be dismissed without hearing. * * *
 *       *       *       *       *
(c) If the Administrator or the Board finds, after notice and hearing, in any investigation instituted upon complaint or upon their own initiative, with respect to matters within their jurisdiction, that any person has failed to comply with any provision of this chapter or any requirement established pursuant thereto, the Administrator or the Board shall issue an appropriate order to compel such person to comply therewith.

5. "(a) The Administrator is empowered and it shall be his duty to promote safety of flight of civil aircraft in air commerce by prescribing and revising from time to time:
 *       *       *       *       *
(2) Such minimum standards governing appliances as may be required in the interest of safety;
(3) Reasonable rules and regulations and minimum standards governing, in the interest of safety, (A) the inspection, servicing, and overhaul of aircraft, aircraft engines, propellers, and appliances; (B) the equipment and facilities for such inspection, servicing, and overhaul; and (C) in the discretion of the Administrator, the periods for, and the manner in, which such inspection, servicing, and overhaul shall be made, including provision for examinations and reports by properly qualified private persons whose examinations or reports the Administrator may accept in lieu of those made by its officers and employees;
(4) Reasonable rules and regulations governing the reserve supply of aircraft, aircraft engines, propellers, appliances, and aircraft fuel and oil, required in the interest of safety, including the reserve supply of aircraft fuel and oil which shall be carried in flight;
 *       *       *       *       *
(6) Such reasonable rules and regulations, or minimum standards, governing other practices, methods, and procedure, as the Administrator may find necessary to provide adequately for national security and safety in air commerce."

6. A description of the FAA's circular system is contained in the initial circular distributed in December, 1962. See Advisory Circular No. 00–01. That circular explains the distinction between the issuance of regulations, on the one hand, and advisory circulars, on the other, and emphasizes the "nonregulatory" nature of the latter.

Section 601 for the creation of standards for INS;

(2) the rescission of all INS authorizations previously issued;

(3) the suspension of all pending applications until such time as rules are promulgated; and

(4) the direction that all carriers, whose pre-existing authority would be so rescinded, might reapply upon approval of the new rules.

By letter dated March 6, 1970, the Administrator responded to INCA's complaint in these words:

Your complaint does not state facts which warrant the issuance of an order under section 1002 of the Federal Aviation Act to effect compliance with that Act in the respects as set forth in your complaint. However, since the arguments set forth in your complaint may indicate a need for a change in the provisions of the Federal Aviation Regulations, the complaint is being considered as a petition for a rule-making action under the procedures of Part II of the Federal Aviation Regulations.

The FAA Director of Flight Standards Service has advised me that a proposal to amend those provisions of the regulations concerning approval for the use of self-contained systems, such as Inertial and Doppler Radar Navigation Systems, is being processed and should be issued as a notice of proposed rule making in the very near future. Your petition will be docketed and considered in connection with that rule making action.

INCA immediately filed a motion for reconsideration in which the central allegation was that "[b]y the conduct described herein, the Administrator has violated and is continuing to violate his obligations under Title VI of the (Act)." It went on to assert that, since Section 901 of the Act imposes a civil penalty of up to $1000 per day upon any "person" who violates Title VI, the Administrator had a pecuniary stake in the disposition of the complaint which disqualified him from its adjudication.[7]

The FAA's General Counsel, acting for the Administrator, notified petitioner, by letter dated April 9, 1970, that its motion for reconsideration was not being granted, because the agency was of the opinion that Section 1002 "does not provide for, nor require, the issuance of the kind of order requested in the complaint. * * * " The letter went on to state that, since INCA did not desire its complaint to be considered as a petition for rulemaking, it would be withdrawn from the rulemaking docket. The complaint was shortly thereafter reinstated on the docket, however, by reason of the receipt of a further letter from INCA stating that, while treatment as a rulemaking petition failed to provide adequate relief, the contemplated rulemaking was nevertheless a proceeding in which INCA wished to participate.[8]

With the matter in this posture, petitioner instituted proceedings successively in the District Court and in this court. On April 28, 1970, INCA filed a civil action in the District Court complaining of the procedural course being followed by respondent in approving

7. See 49 U.S.C. § 1471(a) (1964). Petitioner also insisted that its complaint could not be considered as a petition for rulemaking since (1) rulemaking is prospective only in its operation whereas the complaint sought relief for past and present violations of the Act, and (2) to so treat it would disable petitioner from seeking direct review by a court of appeals under Section 1006. Petitioner also asserted that the Administrator had failed to comply with the statutory requirement of Section 1005(f) that "[E]very order of the Administrator * * * shall set forth the findings of fact upon which it is based. * * * " 49 U.S.C. § 1485(f) (1964).

8. The FAA, on July 30, 1970, issued a Notice of Proposed Rulemaking regarding the establishment of minimum standards for the use of INS. The regulations proposed therein are stated to be "substantially the same as those currently found in [Advisory Circular No. 121–13]." 35 Fed.Reg. 12479 (1970). At the present time, so far as we are advised, those rules remain under consideration.

INS applications. The prayer for permanent injunctive relief, which is still pending in the District Court, seeks to compel the Administrator (1) to prescribe appropriate rules and minimum standards in the interest of safety, (2) to revoke all existing authorizations to use INS, (3) to suspend the issuance of any pending application, and (4) to refrain from approving any future INS application until compliance with the new rules is demonstrated. The District Court was also asked to impose upon the Administrator the civil penalties provided in Section 901.

An application for a temporary restraining order was denied the same day. A motion for a preliminary injunction was, after hearing, denied on May 22; and no appeal has been taken from this order. Turning its attention away from the District Court, but not abandoning its suit therein, INCA filed in this court on June 5 the review petition presently before us.

## II

■ Petitioner contends that our jurisdiction is appropriately derived from Section 1006 of the Federal Aviation Act, 49 U.S.C. § 1486(a) (1964), which reads in pertinent part as follows:

> "Any order, affirmative or negative, issued by the Board or Administrator under this chapter * * * shall be subject to review by the * * * United States Court of Appeals for the District of Columbia upon petition * * * by any person disclosing a substantial interest in such order * * * "

It is doubtless true that orders entered by the Administrator under Section 1002, in which he finds, with or without investigation or hearing, complaints *about third persons* to be meritless, are normally reviewable by this court under Section 1006.[9] Where, however, an interested party files a complaint *about the Administrator*, the Administrator's

recognition and assertion that this is outside the scope of the complaint statute does not constitute an "order" within the meaning of the direct review authorization. That, in essence, is what has occurred here.

The thrust of Section 1002 is readily apparent. It provides a procedure whereby any person may bring to the attention of the Administrator a complaint as to statutory violations by third persons. Heretofore this Section has been invoked against alleged violations by, among others, competing air carriers, airline associations, and even individual airline pilots. But our research, as well as that of the parties, has failed to uncover any case in which the statute has been utilized to complain of the Administrator for failure adequately to perform his asserted statutory responsibilities.

■ This is hardly surprising in view of the plain purpose of the Section, which is to provide an independent adjudicatory mechanism for alleged violations. The Section was patently designed to provide a tool for the investigation and adjudication by the Administrator of claimed violations of the Federal Aviation Act by those subject to its terms rather than to serve as a vehicle for challenging official action or inaction. Congress could not rationally be taken to have contemplated the novel circumstance, inherent in INCA's complaint, wherein the Administrator is called upon to investigate and to resolve a complaint against himself. How, realistically, is he to make the initial determination that the complaint against himself is serious enough to deserve investigation? How is that self-inspection to be carried out? And how, as petitioner's claim of disqualification for monetary interest suggests, may he serve as an independent and unbiased judge?

We are reinforced in this conclusion by the statutory definition of the term

9. *See, e. g.,* Trailways of New England, Inc. v. CAB, 412 F.2d 926, 931 (1st Cir. 1969) ; Flying Tiger Line v. CAB, 121 U.S.App.D.C. 332, 350 F.2d 462 (1965), cert. denied, 385 U.S. 945, 87 S.Ct. 316, 17 L.Ed.2d 224 (1966).

"person" as used in Section 1002. That Section, as already indicated, invites complaints "with respect to anything done or omitted to be done by any person." It devolves upon either the Administrator or the Board, as the case may be by reference to their respective jurisdictions, the power and the duty to consider and to resolve the complaint. The Act's definition in Section 101(27) of the term "person" includes

> "any individual, firm, copartnership, corporation, company, association, joint-stock association, or body politic; and includes any trustee, receiver, assignee, or other similar representative thereof."

49 U.S.C. § 1301(27) (1964). Since Section 1002 imposes similar responsibilities on the Administrator and the Board, we have searched for a term within the definition which encompasses both. None could be read to include the Board, and the Administrator could only be held to fall within the definitional perimeter if he were deemed an "individual" for purposes of that Section. Such a designation would compel the doubtlessly unintended conclusion that Section 1002 may be invoked as a weapon against the Administrator's derelictions, but not against those of the Board. That interpretation cannot prevail.[10]

The Administrator, having properly concluded that the complaint was not an appropriate one for consideration under Section 1002, proposed to treat it as a petition for rulemaking. This treatment, with which we are unable to find fault, was based on his recognition that the complaint, in substance, addressed itself to a matter within the FAA's regulatory jurisdiction—a matter already designated to be the subject of a forthcoming rulemaking proposal. Of course it is true that the instigation of rulemaking procedures may not have provided a complete remedy for petitioner, since it was unresponsive to its demands that existing authorizations be rescinded, that all pending applications be suspended, and that all carriers holding authority be made to reapply upon the conclusion of the proceedings. This is presumably why petitioner's first response to respondent's refusal to entertain its complaint was to seek nonstatutory review of the Administrator's conduct in the District Court, alleging the illegality of his procedural handling of INA applications and seeking the aid of the court's equity powers to curb further violations and to erase the approvals already given.

In so doing, we think petitioner sought the right tribunal, where indeed

10. Nothing in the legislative history of Section 1002 supports petitioner's interpretation of that Section. Section 1002 is based on an almost identical provision of the Civil Aeronautics Act of 1938, which was superseded by the Federal Aviation Act of 1958. Section 1002(a) of the 1938 Act stated that "[a]ny person may file with the Authority a complaint in writing against any person * * *." Civil Aeronautics Act of 1938, § 1002(a), 52 Stat. 973, 1018 (1938). The only changes in this section as it was incorporated into the 1958 Act were for the purpose of transferring complaint jurisdiction from the Civil Aeronautics Authority to the FAA and CAB. See 1958 U.S.Code Cong. & Admin.News, pp. 3741, 3758 (1958).

While the legislative history of neither Act provides illumination of the scope of Section 1002, similar provisions in bills considered and discarded by Congress prior to the passage of the 1938 Act reflect the primary thrust of the complaint proc-

ess. Bills pending before both the House and the Senate contained provisions for complaints by any person against "any air carirer." See Hearings on S. 2 Before the Senate Comm. on Interstate Commerce, 75th Cong., 1st Sess. 3 (1937) (§ 304(c)); Hearings on H.R. 5234 Before the House Comm. on Interstate & Foreign Commerce, 75th Cong., 1st Sess. 3 (1937) (§ 304(c)); H.R.Rep.No.911, 75th Cong., 1st Sess. 3 (1937) (considering H.R. 7273). Although no discussion has been found which explains this ultimate expansion, as reflected in the final draft of the 1938 Act, from complaints against "air carriers" to complaints against "any person," we think it logical that the section was broadened to grant the agency power to investigate complaints against the activities of other third persons such as air carrier associations, airline pilots, and other air industry related entities. Certainly we find no hint of a Congressional design to utilize Section 1002 as an agency tool for self-investigation.

it remains today. It was not warranted in turning to this court by reason of its disappointment in the matter of a preliminary injunction. That particular denial by the District Court could have been appealed and summary relief sought here. Instead, petitioner conceived the theory that it could treat the Administrator's handling of its complaint under Section 1002 as an order directly reviewable by us under Section 1006. Finding, as we do, that the controversy was not one appropriate for investigation and resolution by the Administrator under the complaint provisions of Section 1002, his refusal to entertain petitioner's complaint is not an "order" reviewable by this court under Section 1006.[11]

Petition dismissed.

---

11. Nothing in Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970), commands a contrary result. We agree, as we have pointed out above, that where an administrative official has the power to act —*i. e.*, his jurisdiction is properly invoked —if he refuses to act, his "administrative inaction is the equivalent of an order denying relief" (*id.* at 1099) and is susceptible of direct review. The distinction here is that no order was issued by the Administrator because he was without jurisdiction to enter such an order.