STATE OF ILLINOIS ex rel. William J. SCOTT, Attorney General, and People of the State of Illinois, ex rel. William J. Scott, Attorney General, Plaintiffs,

v.

Alexander P. BUTTERFIELD, Administrator, Federal Aviation Administration, et al., Defendants.

No. 74 C 2410.

United States District Court, N. D. Illinois, E. D.

June 16, 1975.

William J. Scott, Atty. Gen. of Ill., Chicago, Ill., for plaintiff.

James Michael Keane, Chicago, Ill., for Village of Schiller Park, intervenor.

Arnold Kanter, U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

*Motions to Intervene and Motion to Dismiss*

MAROVITZ, District Judge.

### I.

*Background*

Since the passage of the National Environmental Policy Act[1] on January 1, 1970, there has been a plethora of litigation but a dearth of consensus as to the resolution of several issues regarding the construction of said Act. Under the Act, all agencies of the Federal Government are to include in their consideration and development of major federal actions having significant effect on the environment a "detailed statement by the responsible official" on five aspects of the proposed action. They are: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of longterm productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332 (2)(C).

This detailed statement is to be issued only after the "responsible federal official" has obtained input from every federal agency which has "jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* In addition, comments and views of appropriate state and local agencies are to be solicited and appended to the statement. Upon its completion, this report is to be "made available to the President, the Council on Environmental Quality and to the public . . ., and [it. is to] accompany the proposal through the existing agency review processes . . . ." *Id.* Finally, the Act provides that these provisions shall be applied by all Federal agencies to the "fullest extent possible." 42 U.S.C. § 4332 (1).

Plaintiffs, the State of Illinois and the People of the State of Illinois, seek declaratory and injunctive relief with regard to certain actions of officers and employees of the Federal Aviation Administration ("F.A.A.") and the Civil Aeronautics Board ("C.A.B.") which have allegedly resulted in the uncontrolled increase in aircraft operations, noise, and air pollutants at O'Hare International Airport in violation of the National Environmental Policy Act ("N.E.P.A.") and other provisions of the law.

Plaintiffs claim that excessive aircraft noise interferes with human speech, sleep and other normal and rea-

---

1. 42 U.S.C. § 4321 *et seq.* (1970) (Pub.L. 91–190, § 2, Jan. 1, 1970, 83 Stat. 852).

sonable activities of the residents and inhabitants of the area adjacent to and surrounding O'Hare Airport. Plaintiffs further allege that said excessive noise deprives plaintiffs of the full, normal and reasonable enjoyment, use and value of their properties.

Plaintiffs make similar claims as to the degradation of air quality caused by excessively large quantities of pollutants both from aircraft emissions and from other mobile air-polluting sources—to wit: that the resulting degradation affects the health, safety and welfare of citizens of the State of Illinois who reside, work, visit, or otherwise frequent the area adjacent to the Airport, and that the resulting degradation deprives the State of Illinois and the citizens of the State of the full or reasonable use of property owned by them which is located in the areas adjacent to and surrounding the Airport.

*The Complaint*

The action is brought in six counts, four of which concern the National Environmental Policy Act. Count I charges that the F.A.A. defendants have failed to prepare an impact statement for certain individual actions as required by the N.E.P.A. The primary allegations read:

Subsequent to January 1, 1970, Defendants Butterfield and Cyrocki, or their predecessors in office, have undertaken the following actions:

a) Pursued a policy of unlimited growth in air traffic at the Airport, resulting in a substantial increase in the daily number of aircraft operations at the Airport;

b) Undertaken and completed the installation of various flight control, navigational and other equipment which has increased the capacity of the Airport to accommodate additional aircraft;

c) Authorized and directed the use by aircraft of a newly constructed runway and taxiway;

d) Established, altered and otherwise changed or controlled the standard flight paths and patterns of aircract arriving at and departing from the Airport;

e) Failed to enact regulations which would reduce or control the emission of noise and other pollutants from aircraft arriving at, departing from, or moving about the Airport; and,

f) Undertaken or completed various other actions which have, or may have, adverse environmental impacts upon the areas adjacent to and surrounding the Airport. Complaint, par. 32

Count II claims that these actions, considered collectively, also constitute a "major federal action significantly affecting the quality of the human environment" for which defendants Butterfield or Cyrocki, or their predecessors in office, were required to prepare a detailed environmental impact statement under the provisions of 42 U.S.C. § 4332 (2)(C).[2]

Count III claims that the F.A.A. defendants have failed to consider environmental factors and appropriate alternatives to their actions as required by the N.E.P.A., and particularly Sections 102(2)(A), 102(2)(B), and 102(2)(D) therein.[3]

---

2. Also referred to as § 102(2)(c) of the National Environmental Policy Act.

3. 42 U.S.C. §§ 4332(2)(A), (B), and (D) respectively. Those sections read:
The Congress authorizes and directs that, to the fullest extent possible:
\*   \*   \*   \*   \*
(2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;
(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality es-

Count IV claims that the F.A.A. defendants have failed to comply with the notice and publication requirements of the Administrative Procedure Act in their promulgation of flight rules and policies.

Count V alleges that the C.A.B. defendants have failed to prepare an impact statement for certain of their actions as required by the N.E.P.A. Plaintiffs aver that subsequent to January 1, 1970, the C.A.B. defendants, or their predecessors in office, have, as a matter of policy, established O'Hare as a central airport for national and international commerce, and that in furtherance thereof these defendants have authorized numerous commercial air carriers to engage in air transportation at the Airport, resulting in a significant increase in the number of aircraft utilizing the Airport and a significant increase in the amount of noise and air pollutants emitted into the outdoor atmosphere of the area adjacent to and surrounding the Airport.

Finally, Count VI claims that all the defendants have unlawfully performed actions which have created a nuisance in the State of Illinois.

Though the relief sought varies from count to count, the overall gist of plaintiffs' prayer seeks a declaratory judgment that defendants' actions which result in an increase in the number of aircraft arriving at and departing from O'Hare are unlawful due to the absence of an environmental impact statement and due to a failure to abide by the Administrative Procedure Act, and further seeks an injunction in the increase of aircraft operations pending compliance with § 4332(2)(C) of the National Environmental Policy Act of 1969.

## II.

### Motions to Intervene

█ Four local governments and one environmental organization have applied to intervene as plaintiffs in this action. Fed.Rules Civ.Proc. Rule 24, 28 U.S.C. They are the City of Park Ridge, the City of Des Plaines, the Village of Niles, the Village of Schiller Park, and the National Organization to Insure a Sound-controlled Environment. Rule 24 (b), the content of which deals with permissive intervention, states, "Upon timely application anyone may be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Each applicant-intervenor has filed a complaint substantially identical to the complaint of the State of Illinois, and the intervenors are amenable to the submission of joint pleadings and briefs, reserving the right to file a supplemental brief to that filed by the State of Illinois and the People of this State. Each intervenor also reserves the right to represent interests of its citizens that may be different from the interests of the State of Illinois should this cause reach trial. The applications to intervene pursuant to Rule 24(b) are granted. We do not decide whether these parties may intervene as of right under Rule 24(a).

## III.

Defendants move to dismiss this suit pursuant to Fed.Rules Civ.Proc. Rules

---

tablished by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

\* \* \* \* \*

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources; . . . .

12(b)(1), 12(b)(6), and 12(b)(7), 28 U.S.C.[4]

*Jurisdiction over Subject Matter*

Jurisdiction herein is invoked pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), 28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 1337 (commerce), and 5 U.S.C. §§ 701–706 (Administrative Procedure Act). Defendants deny this court's jurisdiction under the above-enumerated statutes, and further argue that jurisdiction is barred by the doctrines of sovereign immunity and failure to exhaust remedies.[5]

In *Pennsylvania Environmental Council, Inc.* v. *Bartlett*, 315 F.Supp. 238 (M.D.Pa.1970), *aff'd*, 454 F.2d 613 (3d Cir. 1971), an action was brought to enjoin a planned relocation of a highway and to require upgrading and repairing of an existing roadway. The claim was grounded, in part, on plaintiffs' contention that defendants were in violation of the N.E.P.A. In a footnote the district court said, ". . . [J]urisdiction clearly exists under the Administrative Procedure Act and the Federal Question Statute." 315 F.Supp. at 240 n. 1. Unfortunately, the issue is not quite that clear. As the court notes in *Charlton* v. *United States,* 412 F.2d 390, 396 (3d Cir. 1969) (concurring opinion):

There continues to be a dispute in the courts and in academic circles as to whether the Administrative Procedure Act is jurisdictional, i. e., whether the Act itself is an affirmative grant of jurisdiction to the district courts to review agency action according to its terms absent any other basis for federal jurisdiction. *See, e. g., Toilet Goods Ass'n, Inc.* v. *Gardner,* 360 F. 2d 677, 679, n. 1 (2d Cir. 1966), *aff'd,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed. 2d 697 (1967); *Cappadora* v. *Cele-*

*brezze,* 356 F.2d 1 (2d Cir. 1966); *Ove Gustavsson Contracting Co.* v. *Floete,* 278 F.2d 912 (2d Cir.), *cert. denied,* 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188 (1960); *Powelton Civic Home Owners Ass'n.* v. *HUD,* 284 F. Supp. 809, 819–820 (E.D.Pa.1968). See also Jaffe and Nathanson, Administrative Law—Cases and Materials 288 (3d ed. 1968); Jaffe, Judicial Control of Administrative Action 528 (1965); 3 Davis, Administrative Law Treatise 291 (1958); Byse and Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308, 326–331 (1967).

We are inclined to agree with *Charlton,* however, that:

Although the Supreme Court has not expressly decided the issue, decisions of the Court . . . offer support to the position that one "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, * * *" 5 U.S.C. § 702, may seek review of such action under the Administrative Procedure Act. *See, e. g., Abbott Laboratories* v. *Gardner,* 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Rusk* v. *Cort,* 369 U.S. 367, 371–372. 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). 412 F.2d at 396.

Similarly, there is a dispute whether the N.E.P.A. provides substantive rights which imply a remedy pursuant to § 1331 jurisdiction. Several cases have recognized subject matter jurisdiction under this statute. *See, e. g., Sierra Club* v. *Froehlke,* 359 F.Supp. 1289 (S.D.Tex.1973); *Harrisburg Coalition Against Ruining the Environment* v. *Volpe,* 330 F.Supp. 918, 921 (M.D.Pa. 1971); *Ely* v. *Velde,* 321 F.Supp. 1088,

---

4. Rule 12(b)(1) asserts lack of jurisdiction over the subject matter; Rule 12(b)(6) asserts failure to state a claim upon which relief can be granted; Rule 12(b)(7) asserts failure to join a party under Rule 19.

5. While these doctrines are probably more appropriately discussed with Rule 12(b)(6), we confront the issues here for convenience and clearer organization.

1094 (E.D.Va.1971); *Pennsylvania Environmental Council, Inc. v. Bartlett, supra.*

In *Sierra Club v. Froehlke,* 486 F.2d 946 (7th Cir. 1973), the court examined whether an environmental impact statement prepared by the Corps of Engineers concerning a flood control dam project on the Kickapoo River, Wisconsin, complied with the mandates of the N.E. P.A. The court reaffirmed its view that, "Pro forma compliance with the substantive guidelines of [Section 4331] simply will not suffice. [Section 4332] of NEPA provides that its procedures be implemented and carried out 'to the fullest extent possible.' *Scherr v. Volpe,* 466 F.2d 1027, 1031 (7th Cir. 1972)." 486 F.2d at 953. The court continued, "In light of these statements, we feel compelled to hold that an agency's decision should be subjected to a review on the merits to determine if it is in accord with the substantive requirements of NEPA." If, as the Seventh Circuit indicates, this court has jurisdiction to review an environmental impact statement on the merits, *a fortiori* the court must have jurisdiction to determine whether said statement is required at all. To hold otherwise is to allow an agency to circumvent review merely by failing to file a statement. *See also, Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972) *(Hanly II)* (court review of agency's decision not to file an environmental impact statement).

■ In light of our determination that our jurisdiction is properly invoked pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act, we decline to rule on the other alleged bases of jurisdiction.

■ Further, we do not consider this suit barred by the doctrine of sovereign immunity. *National Helium Corp. v. Morton,* 486 F.2d 995 (10th Cir. 1973); *Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army,* 325 F. Supp. 749, 763 (E.D.Ark.1971); *Crowther v. Seaborg,* 312 F.Supp. 1205, 1219 (D. Colo.1970). In *National Helium* the court ruled that divers helium purchase contracts entered into pursuant to the Helium Act, 50 U.S.C. § 167 *et seq.,* could not be terminated by the Secretary of the Interior without the filing by the Interior Department of an environmental impact statement in accordance with the dictates of the N.E.P.A. To the defense of sovereign immunity the court stated, 486 F.2d at 1000:

> We have fully considered the Supreme Court cases which prohibit injunctive relief against governmental officers on account of their upholding the rights of the government arising under a contract. Such a suit is distinguished by the Supreme Court from actions seeking compensations for an alleged wrong and are regarded as actions against the sovereign to which there has not been consent. . . .
>
> \*   \*   \*   \*   \*   \*
>
> We view the action seeking to require the Department to file an impact statement to stand on a different footing in relationship to the sovereign immunity doctrine and the cited cases because the action merely seeks to obtain compliance with the National Environmental Policy Act of 1969 and is not for the purpose of asserting and enforcing a private right. . . . (citations and footnotes omitted).

Thus, we do not find this doctrine availing as a bar to plaintiffs' maintenance of this suit.

■ Nor do we find that we should dismiss for plaintiffs' failure to exhaust administrative remedies, inasmuch as we discern no formal steps as yet untaken by plaintiffs which will provide them an opportunity to urge defendants to comply fully with the N.E.P.A., and the result of which would produce an agency order subject to judicial review. *Cf., Jewel Companies, Inc. v. F.T.C.,* 432 F.2d 1155, 1159 (7th Cir. 1970).

Defendants suggest that plaintiffs have bypassed their administrative remedy provided in 49 U.S.C. § 1482(a). That section provides, in part:

> Any person may file with the Administrator or the Board, as to matters

within their respective jurisdictions, a complaint in writing with respect to anything done or omitted to be done by any person in contravention of any provisions of this chapter, or of any requirement established pursuant thereto.

In *International Navigator's Council of America* v. *Shaffer*, 144 U.S.App.D.C. 29, 444 F.2d 904 (1971), this section was held unavailable as a means to compel the Administrator of the F.A.A. to perform his statutory duties under the Federal Aviation Act. "The Section was patently designed to provide a tool for the investigation and adjudication by the Administrator of claimed violations of the Federal Aviation Act by those subject to its terms rather than to serve as a vehicle for challenging official action or inaction." 444 F.2d at 908. ". . . [O]ur research . . . has failed to uncover any case in which the statute has been utilized to complain of the Administrator for failure adequately to perform his asserted statutory responsibilities." *Id.*

We have also reviewed the F.A.A. and C.A.B. procedures for implementation of the National Environmental Policy Act of 1969. 39 Fed.Reg. 35231 (1974); 40 C.F.R. § 399.110. While these procedures have provisions for citizen involvement in preparation of the environmental impact statement, the procedures are deficient in providing for citizen views as to whether said statement is required in the first instance.

Thus we conclude that plaintiffs have no additional avenues of relief to pursue, and the action does not fall for failure to exhaust administrative remedies.

*Complaint States a Claim Upon Which Relief Can Be Granted*

Defendants assert that the allegations in paragraph 32 of the complaint [6] do not refer to specific, concrete and affirmative actions which this court is to review; rather, defendants' alleged actions are said to concern F.A.A. policy, operations, and "various other actions which have, or may have, adverse environmental impacts", and which defendants consider too abstract to qualify as "major federal actions" sufficient to state a claim. Clearly, though, this is incorrect. The Council on Environmental Quality, in its guidelines for preparation of environmental impact statements, said as to types of actions covered by the Act:

§ 1500.5

(a) "Actions" include but are not limited to:

(1) Recommendations or favorable reports relating to legislation including requests for appropriations . . . .

(2) New and continuing projects and program activities: directly undertaken by Federal agencies; . . . or involving a Federal lease, permit license certificate or other entitlement for use . . .

(3) The making, modification, or establishment of regulations, rules, procedures, and policy. 40 C.F.R. § 1500.5

Since the actions described in paragraph 32 of the complaint are alleged to be those of administrators of the F.A.A., those actions are necessarily "Federal."

In *Scientists' Institute for Public Information, Inc.* v. *Atomic Energy Commission*, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973), the court noted:

The legislative history of the Act indicates that the term "actions" refers not only to construction of particular facilities, but includes "project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs * * *." Thus there is

"Federal action" within the meaning of the statute not only when an agency proposes to build a facility itself, but also whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment. NEPA's impact

6. Set forth in this opinion in the first paragraph of the section entitled "The Complaint."

statement procedure has been held to apply where a federal agency approves a lease of land to private parties, grants licenses and permits to private parties, or approves and funds state highway projects. In each of these instances the federal agency took action affecting the environment in the sense that the agency made a decision which permitted some other party—private or governmental—to take action affecting the environment. (footnotes omitted). 481 F.2d at 1088–1089.

■ Further, we do not consider the suit vulnerable to attack simply because O'Hare International reached its tremendous size prior to the enactment of the N.E.P.A. The requested relief is directed towards a meaningful environmental evaluation of a *further* increase in aircraft traffic and operations. The problem of retroactive application is addressed by Guideline 11 of the Council on Environmental Quality,[7] which provides:

> To the maximum extent practicable the section 102(2)(C) procedure should be applied to further major Federal actions having a significant effect on the environment even though initiated prior to enactment of the Act on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequenses not fully evaluated at the outset of the project or program.

In *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275 (9th Cir. 1973), the court discussed this guideline, saying:

> The fact that it is not practicable to reassess the basic course of action does not mean that an environmental impact statement need not be filed prior to a further major action taken

pursuant to that basic course of action. The qualifying language in the second sentence of Guideline 11 is not intended to eliminate the possibility of a [§ 4332(2)(C)] statement. Rather, it serves to advise that while it may be deemed too late to reassess the project as a whole, further incremental major actions must be shaped so as to minimize adverse environmental consequences, and "to the maximum extent practicable," the [4332(2)(C)] procedure must be complied with.

And recently the Seventh Circuit in *Swain* v. *Brinegar*, 517 F.2d 766 (7th Cir., 1975), affirmed its language in *Scherr* v. *Volpe*, 466 F.2d 1027 (7th Cir. 1972), that "Although the Act is not to be given retroactive effect, it does apply . . . to certain projects 'ongoing' when the Act became effective." 466 F.2d at 1034.

Thus it would seem that the kind of activity described in paragraph 32 of the Complaint is just the kind of "further incremental major actions" to which the CEQ was addressing itself in Guideline 11. Thus, while no claim would lie which compels the production of an environmental impact statement reviewing the feasibility of maintaining O'Hara as a major commercial international airport in light of its reputation as a significant source of pollution, we believe a claim would lie which compels the production of a statement giving consideration to the environmental effects of activities creating increased operational growth of theAirport.

Count II of the Complaint differs from Count I in that it challenges defendants' failure to prepare an impact statement with respect to the collective impact of certain actions as opposed to an impact statement for just particular actions. Count II states a separate claim than Count I. *Scientists' Institute for Public Information, Inc.* v. *Atomic Energy Commission*, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1086–1088 (1973). This

---

7. Guideline 11, CEQ Guidelines, 36 Fed.Reg. 7724 (April 23, 1971).

is seen in Council on Environmental Quality, Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements (May 16, 1972).[8]

> Individual actions that are related either geographically or as logical parts in a chain of contemplated actions may be more appropriately evaluated in a single, program statement. Such a statement also appears appropriate in connection with * * * the development of a new program that contemplates a number of subsequent actions. * * * [T]he program statement has a number of advantages. It provides an occasion for a more exhaustive consideration of effects and alternatives than would be practicable in a statement on an individual action. It ensures consideration of cumulative impacts that might be slighted in a case-by-case analysis. And it avoids duplicative reconsideration of basic policy questions.

> \* \* \* \* \* \*

■ Assuming, *arguendo*, we are incorrect in finding that paragraph 32 of the Complaint adequately avers major Federal action significantly affecting the quality of the human environment, Count III—alleging violations of 42 U.S.C. §§ 4332(2)(A), (B), and (D)[9]— nonetheless states a claim. In *Hanly* v. *Kleindienst*, 471 F.2d 823 (2d Cir. 1972) (action to enforce compliance with the N.E.P.A. with respect to erection of a jail and other facilities), the court reasoned that these substantive sections could not be subject to the "major Federal action" stricture accompanying § 4332(2)(C). "Indeed if they were so limited [§ 4332(2)(D)], which requires the agency to develop appropriate alternatives to the recommended course of action, would be duplicative since [§ 4332(2)(C)], which does apply to actions 'significantly affecting' the environment, specifies that the detailed im-

pact statement must deal with 'alternatives to the proposed action.' 42 U.S.C. § 4332(2)(C)(iii)." 471 F.2d at 834–835.

*Hanly's* view that §§ 4332(2)(A), (B), and (D) stand independent of § 4332(2)(C) is further strengthened by its holding that § 4332(2)(B) requires that before a preliminary or threshold determination of significance is made the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision. 471 F. 2d at 836. "Otherwise the agency, lacking essential information, might frustrate the purpose of NEPA by a threshold determination that an impact statement is unnecessary. Furthermore, an adequate record serves to preclude later changes in use without consideration of their environmental significance as required by NEPA. (Footnote omitted)." *Id*. at 835.

Having concluded that a claim is stated against the F.A.A. defendants, it is but a minor extension of reasoning to so hold as to the C.A.B. defendants. The Civil Aeronautics Board has the statutory power to issue, alter, amend, modify, suspend or revoke air carrier permits or certificates of convenience and necessity. 49 U.S.C. §§ 1371 and 1372. The complaint alleges that the Board, in deciding whether or not to award, amend, or concel said permits or certificates, has assumed or adopted a policy that the airport shall be used as a primary point for the transfer of passengers and cargo traveling in air commerce; that the adoption of said policy has resulted in an unnecessary increase of air traffic at the Airport; and that said policy has never been subjected to the scrutiny required by N.E.P.A.

■ The C.A.B. defendants have replied that, "With regard to Board authorizations for commercial air carriers to

---

8. Reprinted in 3 BNA Environment Reporter 82, 87.

9. See note 3, *supra*.

engage in air transportation at O'Hare, and particularly Board action since January 1, 1970, there is no evidence indicating the adoption of a policy to make O'Hare a central or hub airport. The State has failed to identify where a statement of this alleged policy appears, or to suggest, if the alleged policy has not been formally enunciated, what events in a course of conduct by the Board have led to the *de facto* establishment of this policy." [10] The short reply to that argument is that plaintiffs need not submit any evidence to withstand a motion to dismiss. A court assumes the verity of all well-pleaded facts on a motion to dismiss, and a complaint will not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L. Ed.2d 80 (1957).

In the policy statements of the C.A.B. dealing with implementation of the National Environmental Policy Act of 1969,[11] the Board said in part:

. . . [T]he Board believes that those of its actions which may fall within the category of "major Federal actions significantly affecting the quality of the human environment" are primarily, but not exclusively, those licensing activities which result in the authorization of air transportation—

(i) * * *; or

(ii) To be operated under conditions or with equipment which might result in changes significantly affecting noise or air pollution levels.

*Examples would include* . . . *the authorization of a substantial increase in service at existing airports,* the authorization of service . . . by aircraft with unusual noise or air pollution characteristics, or the au-

thorization of service which requires flight patterns, altitudes, or other operating characteristics which might result in a substantial or unusual environmental impact. (Emphasis added). 14 C.F.R. § 399.110(c)(1)

Interestingly, at least one federal appellate court held prior to N.E.P.A. that questions of environmental impact are are proper "public interest" questions in the Board's certification inquiry. *Palisades Citizens Association, Inc.* v. *Civil Aeronautics Board,* 136 U.S.App.D. C. 346, 420 F.2d 188, 192 (1969). How strange it would be to hold now, with the advent of the N.E.P.A., that the Board has a lesser duty.

In holding thus far that Counts I–V have stated claims upon which relief can be granted, we are not swayed to consider otherwise by defendants' authorities. For example, in *City of Boston* v. *Volpe,* 464 F.2d 254 (1st Cir. 1972), the City of Boston was appealing the denial of a preliminary injunction which would have restrained the Massachusetts Port Authority from continuing construction of the Outer Taxiway at Logan Airport, pending decision on the merits of Boston's complaint that many federal statutes and regulations, including the N.E.P.A., had not been complied with in connection with the processing of the Port Authority's request for a federal airport development grant. Inasmuch as the City of Boston abandoned its claim to preliminary relief against the federal defendants in the district court [12], the First Circuit was confronted with the threshold issue of "not whether the federal agencies have failed to follow the procedures, but whether, assuming such failure, a preliminary injunction should be issued—not against the agencies—but against the Port Authority." [13] That court was resolving the factual issue of when, in light of the Airport and Airway Development Act, the feder-

---

10. Memorandum in Support of Defendants' Motion to Dismiss, p. 18.

11. Code of Federal Regulations, Title 14, Chapter II, Subchapter F, Part 399, Subpart

J—Policies Relating to the Quality of the Human Environment.

12. 464 F.2d at 257 n. 4.

13. 464 F.2d at 257. Footnote omitted.

al government becomes a partner with a local authority for purposes of subjecting the local authority to the strictures both of that act and of the National Environmental Policy Act. Our concern is clearly distinguishable; we must resolve what constitutes "major action", and not what constitutes "Federal."

In *Virginians for Dulles* v. *Volpe,* 344 F.Supp. 573 (E.D.Va.1972), suit was brought primarily against the F.A.A. as operator of the Washington National Airport, and against the commercial airlines which operate jet aircraft at that airport. The complaint alleged, *inter alia,* F.A.A. violations of the N.E.P.A., and sought to reduce alleged pollution from aircraft emissions and aircraft noise through the "prompt phasing out of all jet aircraft operations from the airport," 344 F.Supp. at 575, or at least abatement of jet operations through diversion to other local airports. Specifically, plaintiffs claimed that introduction of the Boeing 727–200 jets at Washington National Airport in 1968 was a "major action" requiring an environmental impact statement under § 4332(2)(C) of the Act.

Following a trial on the merits, the court concluded that "the airport has certainly reached that stage of completion that 'the costs already incurred' in adopting and using it as a commercial jet airport 'so outweigh the benefits of altering or abandoning' it as such that 'no feasible and prudent alternative to the use' would exist. *Arlington Coalition* v. *Volpe,* 458 F.2d 1323 (4th Cir. 1972.)" [14] The court further concluded that the introduction of the Boeing 727–200 jet into Washington National Airport in 1968 was not a "major action" as that term is used in § 4332(2)(C) because the difference between the 727–200 jet and the 727–100 jet (the predecessor of the 727–200 jet) is minimal insofar as " 'affecting the quality of human environment' is concerned." [15]

We note, initially, that the suit herein is not directed to the shut-down of O'Hare International Airport or any phase thereof; the attack is directed at its *unstudied* growth and the requested injunction is aimed at *further increases* in operation pending compliance with the N.E.P.A. More importantly, for purposes of relating *Virginians for Dulles* to the case at bar, is the fact that the court's conclusions were drawn from evidence at trial; evidently the court concluded that the complaint therein stated a claim upon which relief could be granted. Hence we do not view *Virginians for Dulles* as contradicting our conclusion.

■ Count VI sounds in tort, and claims that all defendants have unlawfully exercised their power and jurisdiction over aircraft moving in interstate commerce by unreasonably failing to utilize existing technologies for the control of aircraft noise and air pollutant emissions, thereby inflicting injury on persons and property in the neighborhood of O'Hare and creating a nuisance in the State of Illinois. Defendants urge dismissal of this count on the alternative grounds that: (1) Congress has preempted the field of common law nuisance actions based upon aircraft noise and air pollution, or (2) where a public or semipublic enterprise is authorized by statute, nuisance claims arising out of proper operations are to be denied. We agree with defendants that Count VI must be dismissed, but we make our determination on different grounds. For even assuming, *arguendo,* that federal regulations have not pre-empted the field of common law nuisance as to aircraft noise and air pollution and that the doctrine of legalized nuisance does not apply, we find—based on the authority of *Griggs* v. *Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962)—that liability for the nuisance claim lies with the City of Chicago and does not lie against the federal defendants.

14. 344 F.Supp. at 577–578.

15. 344 F.Supp. at 578.

In *Griggs,* Allegheny County owned and maintained the Greater Pittsburgh Airport at a site it acquired to provide airport facilities under the National Airport Plan.[16] In one approach zone the pattern of flight established by the Civil Aeronautics Administrator[17] for aircraft landing at and departing from the airport required aircraft to fly regularly and frequently at very low altitudes over Griggs' residential property. The resulting noise, vibrations and danger forced Griggs and his family to move from their home. The Supreme Court held, with Justices Black and Frankfurter dissenting, that the County had taken an air easement over Griggs' property for which it had to pay compensation. The dissent felt that the United States, and not the Greater Pittsburgh Airport, had "taken" the airspace over Griggs' property. 369 U.S. at 91, 82 S. Ct. 531.

The *Griggs* Court reasoned:

It is argued that though there was a "taking," someone other than respondent was the taker—the airlines or the C.A.A. acting as an authorized representative of the United States. We think, however, that respondent, which was the promoter, owner, and lessor of the airport, was in these circumstances the one who took the air easement in the constitutional sense. Respondent decided, subject to the approval of the C.A.A., where the airport would be built, what runways it would need, their direction and length, and what land and navigation easements would be needed . . .

[I]t is the local authority which decides to build an airport *vel non,* and where it is to be located. We see no difference between its responsibility for the air easements necessary for operation of the airport and its responsibility for the land on which the runways were built. (Footnote omitted). 369 U.S. at 89, 82 S.Ct. at 533.

Plaintiffs argue that *Griggs* is no longer viable since the passage of the Federal Aviation Act of 1958,[18] asserting that said Act created a structure which provided for total federal control over the routing of commercial air carriers and over the design of aircraft as well as more control over the design of airports.[19]

We think plaintiffs should note that the dissent made this same argument, stating:

Congress has over the years adopted a comprehensive plan for national and international air commerce, regulating in minute detail virtually every aspect of air transit—*from construction and planning of ground facilities* to safety and methods of flight operations . .

These airspaces are so much under the control of the Federal Government that every takeoff from and every landing at airports such as the Greater Pittsburgh Airport is made under the direct signal and supervisory control of some federal agent.[20] 369 U.S. at 92–93, 82 S.Ct. at 535–536.

We must assume that since the majority of the Court rejected that argument then, the Court would do likewise today.

---

16. 49 U.S.C. § 1101 *et seq.* Repealed and replaced by 49 U.S.C. § 1711 *et seq.*

17. The duties of the Civil Aeronautics Administrator were transferred to the Federal Aviation Agency Administrator, 72 Stat. 806–807, and most recently to the Secretary of Transportation and the Federal Aviation Administrator within that Department. 80 Stat. 931.

18. 72 Stat. 739.

19. Inasmuch as O'Hare International Airport was originally designed (under a different name) as a military port in 1941, and began commercial flights in 1946, one might argue that increased *federal control of airport design* in 1958 is irrelevant. We do not, however, rest our decision on this reasoning.

20. Emphasis added and footnotes omitted.

Further, it is clear that plaintiffs could plead a good claim against the City of Chicago as proprietor of O'Hare International Airport. In *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), the Court had occasion to discuss—albeit in a footnote—the putative right of an airport proprietor to issue aircraft noise regulations in light of pre-empting federal legislation. The footnote says, in part:

> The letter from the Secretary of Transportation also expressed the view that "the proposed legislation will not affect the rights of a State or local public agency, *as the proprietor of an airport,* from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners *acting as proprietors* can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory." (Emphasis added.)

> \*   \*   \*   \*   \*   \*

Appellants and the Solicitor General submit that this indicates that a municipality with jurisdiction over an airport has the power to impose a curfew on the airport, notwithstanding federal responsibility in the area . . We do not consider here what limits, if any, apply to a municipality as a proprietor.

■ Plaintiffs contend that a nuisance action against the City of Chicago is ineffective because of the pre-emptive effect of federal legislation. But both pieces of legislation to which plaintiffs apparently refer—the Noise Control Act of 1972[21] and the Clean Air Act[22]—contain specific provisions for citizen suits[23] against appropriate federal defendants.

Finally, while we recognize that *Griggs* differs from the case at bar in that it involved the Federal Airport Act, since repealed, and the "taking" of property under the Fourteenth Amendment, we still consider the case controlling. All salient sections of the legislation relied upon in the *Griggs* opinion have been incorporated in substantially identical language in the Airport and Airway Development Act of 1970, 49 U.S.C. § 1701 *et seq.*, and particularly § 1711 *et seq.* Further, both cases involve similar tortious behavior with the result that the reasoning of *Griggs* is generally applicable to this claim. Thus, Count VI is dismissed.

### Suit not Lacking Person Needed for Just Adjudication

■ We see no merit in defendants' motion to dismiss this suit for plaintiffs' failure to sue the City of Chicago. As plaintiffs note, since the City of Chicago is subject to service of process and its joinder would not deprive this court of jurisdiction, the City of Chicago ("Chicago") is at very most "a party to be joined if feasible." Fed.Rules Civ.Proc. Rule 19, 28 U.S.C.A. The suit is certainly not susceptible to dismissal under Rule 12(b)(7).

Rule 19(a) reads, in pertinent part:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action

---

21. 42 U.S.C. § 4901 *et seq.*

22. 42 U.S.C. § 1857 *et seq.*

23. 42 U.S.C. § 4911 and 42 U.S.C. § 1857h–2, respectively.

and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his claimed interest.

Should this court hold for plaintiffs on the merits and enjoin further increases in aircraft operations and further issuing of carrier permits pending the filing of an environmental impact statement, it is clear that Chicago is not needed to execute said relief. Further, no argument is seriously proffered that Chicago's absence leaves any of the persons already parties subject to multiple or inconsistent obligations.

We need only consider, then, whether Chicago's absence will, as a practical matter, impair or impede its ability to protect its interest relating to the subject of this action. We do not believe that it will. First, defendants' cries of economic deterioration and damage to the City of Chicago are fanciful; the proposed relief would essentially maintain the status quo pending the filing of an environmental impact statement. More significantly, it is inconceivable that either the F.A.A. or C.A.B. could produce a meaningful statement without consulting the City of Chicago for its views and without balancing in among the factors adduced the economic impact of any proposed action on the City of Chicago. The City of Chicago is not prejudiced by its absence, and we hold that the City is not a party to be joined if feasible.

There being no further arguments of merit to consider, we order that defendants shall answer or further plead to Counts I–V of the Complaint. The motions to intervene are granted subject to the conditions stated herein, and defendants' motion to dismiss is denied except as to Count VI.