**CITY OF IRVING, TEXAS; Allene Harrington; Robert Harrington; and R. D. Harrington, Plaintiffs,**

v.

**FEDERAL AVIATION ADMINISTRATION; J. Lynn Helms, Administrator of Federal Aviation Administration; C. R. Melugin, Jr.; City of Dallas, Texas; City of Fort Worth, Texas; DFW Regional Airport Board; Ernest E. Dean, Executive Director; Jack Downey, Deputy Executive Director; and, Michael T. Brock, Director of Operations; and Air Transport Association of America, Defendants.**

No. CA 3–81–0947–R.

United States District Court,
N. D. Texas,
Dallas Division.

July 6, 1981.

As Amended Dec. 28, 1981.

18

Don J. Rorschach, City Atty., Irving,
Tex., Cecil W. Casterline, William B. Cha-

ney, Richard L. Allen, John T. Helm, Drew R. Heard, Brett A. Ringle, Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., for plaintiffs.

Lee Holt, City Atty., Analeslie Muncy, Charles M. Bierfeld, Dallas, Tex., for defendant City of Dallas.

Paul C. Isham, Asst. City Atty., Fort Worth, Tex., for defendant City of Fort Worth.

Charles C. Wells, Debra G. Kress, Dallas, Tex., for defendants D/FW Regional Airport Bd. and Dean, Downey and Brock.

Susan V. Cook, U. S. Dept. of Justice, Washington, D. C., Charles Cabaniss, Asst. U. S. Atty., Dallas, Tex., for defendants Federal Aviation Administration, Helms and Melugin.

Lyman M. Tondel, Jr., Cleary, Gottlieb, Steen & Hamilton, New York City, Donald L. Case, Charles Babcock, H. Dudley Chambers, Jackson, Walker, Winstead, Cantwell and Miller, Dallas, Tex., for defendant Air Transport Ass'n of America.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

This suit involves a controversy and a dilemma concerning runway 13L—the northwest-southeast diagonal, "crosswind" runway—at the Dallas-Fort Worth Regional Airport ("DFW").

The controversy is not new. It began even before DFW was opened. And this decision—which denies the plaintiffs' request for a temporary injunction prohibiting tests for a limited 60-day period of a revised south departure path for runway 13L—will not end the controversy. It will continue, after the tests end on August 9, in public hearings and in proceedings before the DFW Board and the Federal Aviation Administration ("FAA") and, perhaps, in judicial review of any subsequent decision by the FAA concerning runway 13L.

The dilemma, however, is new: Will a substantial number of Irving citizens (estimated at 25,000) who live and work in the area affected by the 13L tests be subjected to aircraft noise which disrupts their lives? Or, will a runway which cost $20 million in 1970—whose use is necessary to relieve the acute problems of air traffic congestion at DFW and the resulting inconvenience to the general public—remain essentially useless?

*The History of Runway 13L*

Runway 13L was originally designed to handle the regular *departure* of all aircraft and to handle the *arrival* of aircraft (i) during peak periods of operation, or (ii) when there were strong west winds, or (iii) under any unusual conditions, such as runway repair or construction which closed the parallel north-south runways.

Irving was concerned about runway 13L even before the opening of DFW.[1] Straight departures from and approaches to the runway passed directly over Irving and some of its residential districts. Irving's concern—and the resulting correspondence, meetings with FAA and DFW representatives, and public hearings[2]—resulted in the adoption of a noise abatement procedure: aircraft departing runway 13L would turn 10° left (i.e., north)[3] immediately after takeoff and then southeast again, generally along the route of Highway 114. This 10° north departure path for runway 13L was specifically covered in the original DFW Environmental Impact Statement:

"Runway 13L/31R is a diagonal crosswind runway which will primarily be used for southeast departures and to a lesser degree for landings to the northwest.

"Data provided by wind rose studies indicate that use of runway 31R for land-

---

[1] In the original plans for DFW, runway 13L was to be located north of Highway 114. This was changed, and it was constructed in its present location over the objections of the City of Irving (Def. Exh. 1–2).

[2] See, e.g., Def. Exh. 1, 2 and 3; Pltf. Exh. 11, 13 and 15.

[3] This was subsequently revised to a 15° left turn after takeoff so the planes departing runway 13L would follow Highway 114.

ings will be required for all aircraft during strong northwest wind conditions which may occur two percent of the time. This 2% applies to the total time this runway (31R) may be required for landings by all aircraft using the ILS because of strong northwest winds. It has no reference to departures on runway 13L. The use of 13L for departures will be primarily for the small general aviation aircraft and the smaller turbine powered air carrier flights.

"There will be a noise abatement procedure for departures using runway 13L effecting a 10 degree left turn when weather conditions will permit visual navigation during that phase of the departure. During periods of lowering ceiling and poor visibility, departures will initially proceed southeast along the localizer course of the instrument landing system (ILS) as directed by air traffic control.

"Maximized angles of descent on the glide slope will be used for instrument approaches on runway 31R.

"The runway will be used to insure the efficient and safe operation of the airport, and as necessary to handle traffic during emergency conditions on the airport."

This noise abatement procedure turned the planes departing runway 13L toward Love Field, and required the careful control and "mix" of the air traffic from both airports. The initial DFW airspace studies (Def. Exh. 4) indicated that this could be done safely and without delaying traffic from runway 13L (although this was based upon the assumption that Love Field would not be an air carrier airport).

Irving also felt that it had a commitment from both the FAA and DFW—in view of "repeated assurances" by both these agencies—that the air traffic on runway 13L would not exceed "2% commercial utilization on this runway." This was disputed by the FAA and DFW, who advised Irving on several occasions that the 2% figure applied only to *landings*—and not departures—on runway 13L (Def. Exh. 1, 2).[4]

Under the "Mid-Cities Agreement"—a "Letter of Intent and Agreement between owners of Dallas-Fort Worth Regional Airport and members of the North Texas Regional Airport Committee" executed in December of 1968 (Def. Exh. 4)—Irving also assumed responsibilities for the development of land near runway 13L. Paragraph H of that agreement provides:

"Non-owner Cities through their zoning and subdivision powers will prohibit uses incompatible with airport uses to be located adjacent to the airport proper and will obtain avigation easements through the same powers whenever needed and legally permissible." (Def. Exh. 4.)[5]

However, in August of 1977, Irving granted a request to rezone some of the property nearest runway 13L from industrial/commercial use to "residential or multi-family use." This was done over the protest of several property owners in this area (Def. Exh. 20).[6] Some of the 25,000 Irving citizens now affected by the noise from runway 13L reside in this rezoned area, although many do not.

By late 1979 or early 1980 (Pltf. Exh. 17), several factors combined to cause concern about congestion at DFW and to create a desire among the airlines for increased use

---

**4.** Evidence at the temporary injunction hearing showed that this dispute occurred in April of 1972, when Irving received the current "noise cone" study for DFW (Def. Exh. 12) . . . and in April of 1973, during public hearings on the Master Plan of DFW Regional Airport (Def. Exh. 3) . . . and in June of 1973, when numerous complaints were received about aircraft not making the required 10° turn to the north when departing runway 13L (Pltf. Exh. 13).

**5.** The Irving City Council passed an ordinance enabling it to require the execution of such

avigation easements or releases on December 10, 1975 (Def. Exh. 17–18).

**6.** An objection was filed by the W. O. Harrington Trust and Mrs. Myrtle Kay Harrington, owners of approximately 579 acres in this rezoned area. One of the individual plaintiffs in the present suit, who is now complaining that the aircraft noise from runway 13L makes his property unsuitable for residential development, was the beneficiary of the trust which opposed the zoning change in 1977.

of runway 13L (Pltf. Exh. 26). These factors included:

(i) Love Field had continued to be utilized as both an air carrier and a general aviation airport after DFW opened—a fact not anticipated when DFW was constructed. This made it more difficult to use the noise abatement procedure because of the increased Love Field traffic,[7] and flights departing runway 13L were often delayed on the ground for considerable periods of time. Thus, the runway was used very little.

(ii) Traffic increased at DFW not just by normal growth, but by the deregulation of the airlines—which resulted in a phenomenal increase in the number of flights at DFW (and other airports). For example, prior to June 11, 1981, American Airlines had 148 flights a day at DFW; it now has 215 flights a day. This substantial rise in air traffic has resulted in increasing delays and congestion at DFW because the two north-south parallel runways are not sufficient to handle the increased load.

(iii) The construction of additional runways at DFW (which were in the original plans) has not been possible because of many reasons: an unfavorable bond market, the probable loss of federal funds for airport construction, the heavy losses experienced by most airlines in recent years, uncertainty over terminal design and location, etc.

Thus, the need for additional capacity at DFW was obvious. But there was no money for the construction of new runways—and, even if there was, their completion would take years. Yet, the growth in air traffic, particularly with the effects of deregulation, meant increasing congestion and

delay at DFW. So the airlines were pressing for the only immediate solution they say—the increased and unrestricted use of runway 13L. For example, the President of American Airlines projected these consequences if the restrictions on runway 13L continue:

"Long delays at DFW during the latter part of August, our peak passenger month, are simply unacceptable. Should this situation occur the airlines serving DFW will lose an immense amount of money; the airport's reputation will be severely—and perhaps permanently—damaged; the community will be outraged and all those charged with the efficient operation of the air transport system—airlines, government agencies and airport authority alike—will be justly subjected to heavy criticism. We cannot allow this to happen." (Pltf. Exh. 26).

Under these circumstances, DFW requested that the FAA consider the increased use of runway 13L. A letter in July of 1980 by the DFW Executive Director states:

"It is recognized that the EIS, as well as FAA letters to the City of Irving, committed use of the noise abatement procedures. *At that time FAA assured all concerned that both commitments could be met*—simultaneous use of Love Field and the noise procedures for DFW Runway 13L/31R. We recognize the need to be good neighbors with the communities around the airport. We must also recognize the need to operate the airport to efficiently serve the air transportation needs of the metroplex and to meet our obligations and the commitments made to the users." (Pltf. Exh. 25).[8]

---

**7.** As well as increased traffic to the east of DFW from other airports (Navy Dallas, Addison, Redbird and others), which was "mixed" with the increased DFW and Love Field traffic in a very complex pattern to the east of DFW.

**8.** On his copy of this letter, Jack Downey (DFW Deputy Executive Director) wrote a note: "We need to copy both mayors on this and probably the City of Irving. Certainly Legal. *It will raise a real controversy sooner or*

*later, and I believe it should not be a surprise later to Irving.*" After this, on August 26, Downey wrote another note: "Decided not to advise Public unless something real began to develop." Downey testified that this did not imply that DFW would wait until the tests and the noise began before notifying Irving, but only that DFW would wait until the FAA had determined "there was a real chance of running the tests on runway 13L."

Then, on December 27, 1980, DFW made a specific request that the FAA conduct a test on a short-term basis of "alternate noise abatement procedures for takeoffs on runway 13L during peak periods when present procedures cause extensive delays." (Def. Exh. 8).

The problems with Love Field traffic precluded increased use of runway 13L with the existing 10° north departure. This noise abatement procedure and the DFW Environmental Impact Statement precluded additional use of 13L by a straight-off departure. So the FAA considered an alternate use of runway 13L—a right turn 70° to the south (a 170° heading) immediately upon takeoff.[9] The new south departure route for runway 13L was designed to follow Beltline Road (a north-south street in Irving). Basically, the flights from runway 13L first cross a commercial/industrial area, then a multi-family residential area, and finally single family residences. The aircraft on this new route fly over approximately one-fifth (⅕) of Irving's population of 120,000.

On February 6, 1981, the FAA approved a "test for a limited period not to exceed 60 days" of this revised south departure path for runway 13L (Def. Exh. 9). Before approving this test, the FAA determined that no environmental impact statement (the "EIS") was required under the National Environmental Policy Act of 1969 ("NEPA"), and issued a Finding of No Significant Impact (the "FONSI") (Def. Exh. 10). The FONSI was supported by an Environmental Assessment (Def. Exh. 11)—which concluded that, even though preliminary studies indicated a change in noise levels for the new south departure path for runway 13L, "the temporary nature of the test will not create a significant environmental impact." The Environmental Assessment states:

"This limited test does not commit the FAA to a permanent or continuous utilization of the tested departure procedure. Following the limited test, Runway 13L operations will revert to the current restricted utilization posture.

"The limited test would allow noise data accumulation by the Airport Board. Along with citizen response information and delay-fuel comparisons, the test would provide a current data base or frame of reference to formulate airport policies and/or alternatives.

"If, following the test, the Airport Board informs the FAA that the tested departure procedure should be proposed for permanent implementation, then a detailed environmental assessment and appropriate finding would be completed before the procedure is adopted."

On February 7, 1981, DFW representatives contacted Irving city officials to arrange a meeting to discuss the tests of runway 13L. However, the Irving city elections were then in progress—so the meeting was, *at the request of Irving*, delayed until after the elections. The meeting was finally held on May 1, some two months later. DFW representatives explained the 60-day tests which the FAA would conduct. The Irving officials objected: we have "the strongest reservations about changes in the usage of runway 13. Additional take-off usage of runway 13 may have a very bad noise impact on the City of Irving." (Pltf. Exh. 23).[10]

*The Tests on Runway 13L*

The FAA tests on runway 13L began on June 11, 1981. They are for "a limited period not to exceed 60 days" and will, therefore, end by August 9, 1981.

The tests have two basic purposes: (i) to evaluate the noise and other environmental effects of the new departure route, and (ii) to evaluate the operational aspects of the south departure on runway 13L (e.g., the safe "mix" of DFW air traffic with that of other airports, energy and fuel consump-

9. The original test provided for a 50° turn to the south (a 180° heading). The test was adjusted so the planes departing runway 13L would more accurately follow Beltline Road.

10. Although this meeting was held on May 1, 1981, this suit was not filed by Irving until June 12—one day after the tests had begun.

tion, effect upon DFW capacity and runway delays, etc.). They involve approximately 200 flights per day. Most of these departures are in the early morning (7:00–10:00 a. m.), around noon (from 11:00–1:00), and in the early evening (6:00–8:30 p. m.). At times, the flights depart every 90 seconds. One witness (a homeowner) counted 48 flights from 6–8:30 one night and 62 flights during the same period the next night.

An estimated 25,000 Irving citizens live in the area affected by the tests. A representative group testified at the temporary injunction hearing. From their testimony, it is apparent that the aircraft noise from the tests on runway 13L has a very substantial effect upon their lives and the enjoyment of their homes and families. Specifically, their testimony established that:

... any "normal outside activity" is affected. It is difficult, if not impossible, to carry on conversations in the yard. Neighbors can no longer gather outside to visit. One homeowner saw black smoke from the planes and later found spots of dead grass on his lawn.

... inside activity is affected, too. It is difficult to talk, or watch television, or talk on the phone when the planes come over [the noise duration is from 15–30 seconds]. Children and pets are bothered by the noise. Homeowners have been forced to close their doors and windows and use air conditioning, instead of their ceiling fans.

... at least large classes in math and social studies (which have a 1–90 teacher-student ratio) in a school in the affected area may be disrupted.[11]

In short, the noise "is miserable," "annoying," "very loud," "very disruptive," and makes it impossible for the affected citizens to "enjoy their homes and families."

However, the evidence was undisputed that the 60-day tests present no health problems. The plaintiffs' sound expert, Dr. Alan Marsh, testified that the change in magnitude of sound levels—from 55–60 decibels to 70–80 decibels—was a "very noticeable effect" and, in his opinion, would result in "a vigorous community response" and "a change in the quality of human life, particularly since the peak test flights occurred during leisure time." However, Dr. Marsh also testified that the tests "would have no permanent or long term effects or health problems if the tests stop on August 9"— and that there would be no "immediate health problems, no hearing problems."

Although Dr. Marsh was not qualified as an expert in the health effects of noise, his testimony in this regard agreed with the defendants' experts. Dr. W. Dixon Word (Def. Exh. 23) testified, by stipulation, that the noise levels would not cause auditory damage. And Dr. William Galloway testified that (i) the 10–20 decibel increase in outdoor noise from the 13L tests was "a substantial increase in loudness," but was less than the increase that would result from a chain saw or "rock music," and (ii) that this noise would be reduced by some 10–12 decibels if a person was indoors with windows and doors left open, and by some 20–25 decibels if indoors with windows and doors closed.

*History and Nature of the Lawsuit*

When the tests on runway 13L started on June 11, 1981, the complaints began almost immediately. Irate calls were made to Irving, to DFW and to the FAA. The mayor of Irving was "inundated with calls"—from homeowners, businesses, renters, landlords, real estate developers and agents, persons concerned with churches and schools, etc.— and testified that he "had done nothing but handle airport problems" since his election.

On the second day of the tests (Friday, June 12), this suit was filed by the City of Irving in the 68th District Court of Dallas County. The petition alleged that the 60-day tests being administered by the FAA were objectionable because they exposed human beings to "physically disabling noise levels much in excess of that required to damage the ears and other sensory organs."

---

11. The temporary tests will conclude on August 9, so they will be completed before school resumes after summer vacation.

Apparently, the judge of the 68th District Court was not available; and at approximately 4:45 p. m. on Friday afternoon, Judge Dee Brown Walker of the 162nd District Court—after hearing only from the plaintiffs' attorneys; the defendants were not notified of the filing of the suit or the conference with Judge Walker [12]—issued an *ex parte* temporary restraining order prohibiting further tests on runway 13L. This temporary restraining order was clearly improper:

(i) The FAA—the agency conducting the tests—was not even named as a defendant in the state court action. Since the FAA was an indispensable party, the case should have been dismissed until the FAA was joined. Tex.R.Civ.P. 39(a); Fed.R.Civ.P. 19(a).[13]

(ii) The state court had no jurisdiction over the "nuisance" suit filed by Irving. The United States Supreme Court held over eight years ago that Congress—by its enactment of the Federal Aviation Act and the Noise Control Act—has preempted the regulation of aircraft noise, so that there can be no state or local laws or nuisance suits concerning noise caused by airport operations. *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 633 [93 S.Ct. 1854, 1859, 36 L.Ed.2d 547] (1973); *Luedtke v. County of Milwaukee,* 521 F.2d 387 (7th Cir. 1975).

The defendants removed this case to the federal court on June 14, 1981. At a hearing, Judge Barefoot Sanders pointed out the two fundamental defects in the Irving complaint (absence of the FAA, no claim stated by the "nuisance" allegations because of federal preemption) and dissolved the temporary restraining order. Subse-

quently, Judge Sanders recused himself from further participation because of his ownership of some airport municipal bonds, and the matter was assigned to this Court.

On June 18, 1981, an amended complaint was filed by Irving and three individual homeowners which corrected the defects in the state court petition. The FAA was named as a defendant; and the plaintiffs now alleged that the FAA had violated a federal statute—the National Environmental Policy Act ("NEPA")—by failing to prepare an environmental impact statement under 42 U.S.C. § 4332(2)(C) prior to conducting the tests of runway 13L.[14] This complaint omitted the allegations that the tests were exposing Irving citizens to "physically disabling noise levels"; instead, it alleged (among other things) that the tests subject plaintiffs and other Irving citizens to "unnecessary exposure to excessively high levels of noise, vibrations and pollution." (Amended Complaint ¶ 11).

The Air Transport Association of America (ATA)—an unincorporated trade association whose members include American Airlines, Braniff, Delta, Texas International, and other carriers which operate at DFW—was granted leave to intervene in this case as a defendant on June 18, 1981.

A temporary injunction hearing was scheduled for June 19, 1981. However, this hearing was postponed until June 26—solely because the new attorneys hired to represent Irving and the individual plaintiffs requested a continuance in order to give them time to prepare for the temporary injunction hearing. That hearing was held on Friday and Saturday, June 26 and 27,

---

12. This was contrary to Rules 1.3(1) and (2) of the Dallas Civil Court Rules, but Judge Walker has not adopted these Rules. See *Tower Contracting Co. v. Central States, Etc.,* 581 S.W.2d 724 (Tex.Civ.App.—Dallas 1979, writ ref'd n. r. e.).

13. Even though the temporary restraining order issued by Judge Walker did not enjoin the FAA because it was not a party to the state court suit, *the FAA did voluntarily cease its testing of runway 13L* following receipt of a copy of the temporary restraining order.

14. The amended complaint also alleges that (i) the defendants were negligent in conducting the tests of runway 13L, and (ii) that the tests constituted "damaging" of plaintiffs' property in violation of § 17, Article 1 of the Texas State Constitution. *The plaintiffs sought no temporary injunction based upon these allegations,* so the hearing held on June 26–27, 1981, and this opinion deal only with the plaintiffs' claims that the defendants violated § 4332(2)(C) of the National Environmental Policy Act (NEPA).

1981.[15] *It did not concern the merits of the real controversy* (i.e., whether or not there should be a permanent and increased use of runway 13L); it concerned *only* the limited claim by the plaintiffs that the flights on runway 13L should be enjoined because the FAA violated a federal statute (NEPA) in failing to prepare an environmental impact statement before commencing the tests of the new south departure path.

*The National Environmental Policy Act*

■ The National Environmental Policy Act ("NEPA") was enacted to "declare a national policy which [would] encourage productive and enjoyable harmony between man and his environment" and "to promote efforts which [would] prevent or eliminate damage to the environment . . ." 42 U.S.C. § 4321. In short, NEPA "is our basic national charter for protection of the environment." Council on Environmental Quality, "Regulations for Implementing the Provisions of the National Environmental Policy Act," 40 C.F.R. § 1500.1(a) ("CEQ Regulations").[16]

NEPA requires all federal agencies—including the FAA—to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In particular, this provision requires the FAA to:

(C) include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Before the final environmental impact statement is prepared, the FAA is required to consult with other governments affected by the action, solicit comments from the public, and hold public hearings, if appropriate. CEQ Reg. § 1501.7(1), § 1503.-1(a)(2)(i), § 1503.1(4); FAA Reg. ¶ 308.

■ An environmental impact statement is subject to judicial review. However, the FAA's conclusions in the EIS will be disturbed only if they are arbitrary or capricious or if there is an abuse of discretion; the court must not substitute its own views for those of the FAA as to the merits of the particular project. *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973).

However, NEPA does not require an environmental impact statement to be prepared for every proposed federal action. The FAA must conduct a preliminary review and an environmental assessment to determine whether the proposed action is a *"major Federal action significantly affecting*

---

**15.** Testimony from some 22 witnesses and a mass of documents, charts and maps were presented.

**16.** In Executive Order No. 1191, 3 C.F.R. 124 (1978), President Carter ordered the Council on Environmental Quality ("CEQ") to create a single set of uniform, mandatory regulations to federal agencies for the implementation of the procedural provisions of NEPA. These regulations became effective July 30, 1979, and are binding on all federal agencies. CEQ Reg. § 1500.3. Pursuant to CEQ Reg. § 1507.3, the FAA issued its Order 1050.1C, "Policies and Procedures for Considering Environmental Impacts," 45 Fed.Reg. 2244 (1980). This order became effective December 21, 1979 after being published for public comment and submitted to the CEQ for review. It incorporates and supplements the CEQ regulations to establish FAA procedures for the preparation of environmental impact statements (EIS) and findings of no significant impact (FONSI). The order notes that its provisions have "regulatory significance" due to their reference or incorporation in various provisions of the Federal Aviation Regulations (14 C.F.R. Chapter I).

the quality of the human environment." FAA Reg. ¶¶ 201, 300; 42 U.S.C. § 4332(2)(C). In the preparation of the environmental assessment, it is within the discretion of the FAA to determine whether affected local governments and the public should be consulted. FAA Reg. ¶¶ 203, 210, 213, 214.

Any decision by the FAA that an environmental impact statement is not required—because it has concluded that the action is not "major" or that it will not "significantly affect the quality of the human environment"—is also subject to judicial review. However, here the standard of review is different. Fifth Circuit decisions make it clear that a "reasonableness" standard applies; *Sierra Club v. Hassell*, 636 F.2d 1095 (5th Cir. 1981) holds:

> "These agency determinations [that an EIS is not required] are tested in court under a 'reasonableness' standard. A reviewing court is to review the administrative records *as well as other evidence* to determine whether the agencies adequately considered the values set forth in NEPA and the potential environmental effects of the project before reaching a decision on whether an environmental impact statement was necessary. If the agencies engaged in this analysis and reasonably concluded on the basis of their findings that an impact statement was not required, their determinations will be upheld. See, e.g., *Save the Bay, Inc. v. U. S. Corps of Engineers*, 610 F.2d 322 (5th Cir. 1980); *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973)." (Emphasis added.) [17]

■ If the FAA decides that an environmental impact statement is not necessary—this decision is recorded by the issuance of a Finding of No Significant Impact ("FONSI") based on the environmental assess-

ment, FAA Reg. ¶¶ 300, 330, 331—the agency must develop a reviewable environmental record (although obviously not in the same detail as an EIS). If the FAA has not developed such a reviewable record, then the district court may either:

(i) enjoin the project in question until the agency has completed such a record: *Simmans v. Grant*, 370 F.Supp. 5, 18 (S.D. Tex.1974); *Citizens for Responsible Area Growth v. Adams*, 477 F.Supp. 994 (D.N. H.1979); *City of Romulus v. County of Wayne*, 392 F.Supp. 578 (E.D.Mich.1975); or

(ii) hear evidence on the environmental impact of the project for the purpose of supplementing the administrative record and determining the reasonableness of the agency's conclusion that the project was not a major action having a significant affect upon the human environment: *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 465 (5th Cir. 1973); *Simmans v. Grant, supra* (370 F.Supp. at 13); *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 425 (5th Cir. 1973).

In reviewing the agency's determination that an environmental impact statement was not required, the court must not substitute its own views for those of the agency; "it is not the province of the court to review the agency decision on the merits as to the desirability *vel nom* of the project." *Hiram Clarke Civic Club, Inc. v. Lynn, supra*, 476 F.2d at 425; *Simmans v. Grant, supra*, 370 F.Supp. at 13. Cf. *Stryker's Bay Neighborhood Council v. Karlen, supra*, 444 U.S. at 227–28, 100 S.Ct. at 500.

■ Applying these principles to this case, the Court concludes that the FAA did not act unreasonably in finding that no environmental impact statement was re-

---

**17.** Defendants contend that, despite these Fifth Circuit cases, the correct standard of reviewing an agency decision not to file an EIS is the "arbitrary, capricious, or abuse of discretion test." They point out that the district court in *Sierra Club v. Hassell*, 503 F.Supp. 552, 561 at fn. 1 (S.D.Ala.1980) stated that, after the Supreme Court's decision in *Strycker's Bay Neighborhood Council, Inc. v. Karlen, supra*, "it

is questionable whether the Fifth Circuit [reasonableness] rule in *Save Our Ten Acres v. Kreger . . .* is still the appropriate standard." But the Fifth Circuit pointedly ignored this comment, and applied the "reasonableness standard," in affirming this very decision by the trial court in *Sierra Club v. Hassell*, 636 F.2d 1095, 1097 (5th Cir. 1981).

quired—or in its determination (by the FONSI) that the 60-day test of the new south departure path on runway 13L was not a "major action significantly affecting the quality of the human environment"— because the test is only temporary and does not involve any physically disabling noise levels or any risk to human health or life.[18] Specifically, with regard to the various claims of the parties, the Court finds:

(i) No EIS is required for the temporary tests of runway 13L;

(ii) Any permanent use of the south departure on runway 13L will be a major action significantly affecting the quality of the human environment and will require an environmental impact statement;

(iii) The conclusions in the FONSI issued by the FAA were not unreasonable;

(iv) The FAA did not violate its regulations in issuing the FONSI;

(v) The "commitment" to Irving regarding runway 13L will not support plaintiffs' request for injunctive relief;

(vi) The plaintiffs have not established their right to enjoin the tests on runway 13L; and

(vii) The arguments raised in the defendants' motions to dismiss are not valid, so these motions should be denied.

## No EIS is Required for the Temporary Tests of Runway 13L

No case has considered the issue of whether or not an environmental impact statement is required for a temporary 60-day test being conducted by the FAA. Other decisions involving the FAA's failure to file an EIS have involved actions of a permanent nature:

*Virginians for Dulles v. Volpe*, 541 F.2d 442 (4th Cir. 1976) (FAA's "acquiescence" in the vastly expanded use of Washington National Airport and Dulles Airport requires an environmental impact statement).[19]

*Burbank Anti-Noise Group v. Goldschmidt*, 623 F.2d 115 (9th Cir. 1980) (FAA not required to prepare an environmental impact statement concerning federal financial assistance for the acquisition of an existing airport).

*Citizens for Responsible Area Growth v. Adams*, 477 F.Supp. 994 (D.N.H.1979) (Temporary injunction granted because of FAA's failure to file an EIS concerning various construction projects at regional airport).

*Environmental Defense Fund, Inc. v. Adams*, 434 F.Supp. 403 (D.C.D.C.1977) (Preparation of the "National Airport System Plan" did require an environmental impact statement).

*City of Romulus v. County of Wayne*, 392 F.Supp. 578 (E.D.Mich.1975) (Granting temporary injunction because of FAA's failure to file an adequate EIS concerning construction of proposed runway at county airport).

*State of Illinois ex rel. Scott v. Butterfield*, 396 F.Supp. 632 (N.D.Ill.1975) (Holding that the FAA's failure to file an EIS concerning various actions which increased aircraft operations, noise, and air pollutants—including the use of a new runway, and alterations of the standard flight paths and patterns of aircraft arriving at and departing from O'Hare Airport—was subject to judicial review).

*City of Boston v. Coleman*, 397 F.Supp. 698 (D.Mass 1975) (FAA not required to file an EIS for an airport layout plan

---

**18.** If the FAA's FONSI had been "unreasonable," or if an environmental impact statement was required, the Court would have been required to remand this matter to the FAA for further proceedings. See *Simmans v. Grant, supra* (370 F.Supp. at 18). Then, after the FAA had prepared a proper FONSI or an EIS, *the testing of runway 13L could possibly begin once again.* So any relief to the Irving citizens—even if an injunction was granted to the plaintiffs—might be temporary, at best.

**19.** The trial court held that the introduction of Boeing 727–200 "stretch jets" was not a "major action" (344 F.Supp. 573, at 579); if this had been the only "action" involved at Washington National, the Fourth Circuit would have agreed that no EIS was required (541 F.2d at 445).

involving projects which may be built at some indeterminate time in the future, if at all).

■ Moreover, no uniform test has been articulated for determining whether or not a particular federal action is "major"—and although the law is somewhat more developed as to whether or not an expected environmental impact is "significant"—"the most practicable approach is to consider the issue on a case-by-case determination." *Simmans v. Grant, supra,* 370 F.Supp. at 13. The impact of a particular action "upon the quality of life of those persons living immediately adjacent to it must be closely considered," but neighborhood opposition, standing alone, "does not compel a finding of [a major action having] a significant impact." *Simmans v. Grant, supra,* 370 F.Supp. at 14, 16; *Kisner v. Butz,* 350 F.Supp. 310, 323 (N.D.W.Va.1972).

In this case, *the tests of runway 13L are temporary.* They are to last no longer than 60 days and will, in any event, end by August 9, 1981. Although the noise from the tests is extremely annoying and has a substantial affect upon the lives of a large number of Irving citizens, it is undisputed that the noise levels will not cause auditory damage, that there are no immediate health problems, and there is no risk of any permanent or long term health problems *if the tests are stopped by August 9.*[20] Indeed, one of the very purposes of the tests on

runway 13L is to determine if there are any detrimental environmental consequences of the south departure route and, if they are, the magnitude of them.[21] Therefore, it was not unreasonable for the FAA to find that the temporary 60-day test was not a "major action" and that it did not "significantly affect the quality of human environment."[22]

*Permanent Use of the New 13L Flight Path Will Require An EIS*

The plaintiffs contend that the FAA's authorization of the new south departure path for runway 13L resulted from the pressure of the airlines serving DFW—who wanted to increase the use of runway 13L "in order to alleviate their problems with peak air travel this summer"—and that the FAA "tests" are a subterfuge for permanent use of the new departure path. This contention was not supported by the evidence at the temporary injunction hearing. It was clearly established that the tests were temporary, that they are for a period of no longer than 60 days, and that they will end at least by August 9, 1981.[23]

However, the defendants make one argument which is somewhat disturbing. Their briefs contend:

"The FAA has not by its test taken any action—let alone major—to increase noise in the Dallas-Fort Worth area. The same number of flights are arriving at and departing from DFW Airport every day.

---

20. As discussed above, the plaintiffs first contended that the flights on runway 13L exposed persons to "physically disabling noise levels" that would "damage the ears and other sensory organs." However, this allegation was deleted from the amended complaint, and the plaintiffs made no such claim at the temporary injunction hearing.

21. Defendants argue that the plaintiffs' claim—that an EIS is required for any temporary test of a new departure route—"would require the FAA to forego specific data collection on the noise effects of a particular flight path and permanently adopt such a flight path based upon speculation and non-specific data. This result is so nonsensical that not even Congress would have required it."

22. Although a temporary action may constitute a "major" federal action, *Simmans v. Grant, supra,* 370 F.Supp. at 13–14, this does not mean

that any "temporary" action is a major one. If the flights from runway 13L were exposing persons to "physically damaging noise levels," they would obviously be a major action significantly affecting human environment—*and would be enjoined.* Similarly, if the tests of runway 13L were for a longer period of time, they may constitute a major action with significant environmental affects and could be enjoined even if they were labeled "temporary tests." See CEQ Reg. § 1508.27(b)(7).

23. The FONSI and the environmental assessment furnish support only for a 60-day test. Any attempt to continue the tests after August 9 would be a clear violation of NEPA—and the plaintiffs would be entitled to an injunction stopping any tests on runway 13L after that date.

The noise from the aircraft has simply been redirected for a short period of time. The FAA has thus taken *no action* which increases or decreases noise in the Dallas-Fort Worth area although it concededly has increased the noise over portions of Irving while decreasing noise over other areas of the metroplex."

■ This same argument could support a contention that no EIS would be required even if the new south departure path on runway 13L is intended as a *permanent use.* Although this issue is not presently before the Court, there is no doubt that an environmental impact statement will be required if—following the tests, their analysis, and further proceedings before DFW and the FAA—the proposal is made that the runway 13L test route be made permanent. Specifically:

(i) The permanent change of a departure route on runway 13L would be a "major Federal action." See *State of Illinois ex rel. Scott v. Butterfield, supra; City of Romulus v. County of Wayne, supra; Citizens for Responsible Area Growth v. Adams, supra.*

(ii) The permanent change of the departure route would have a significant affect upon "the quality of the human environment." See *Simmans v. Grant, supra; Virginians for Dulles v. Volpe, supra.*

The mere fact that the DFW aircraft noise is being moved from one area to another does not change this conclusion. And, the evidence at the temporary injunction hearing clearly established that the noise levels from the tests on runway 13L are annoying, disruptive to family life, and would—but for the fact that the tests are temporary, and will end by August 9—be a major action with a significant effect upon the quality of life of the Irving citizens who live in the impacted area.

In addition, the original DFW Environmental Impact Statement contains a specific commitment to the noise abatement procedures on runway 13L. These procedures—and the 10° north departure path—cannot be changed without a revision to the

original Environmental Impact Statement. See FAA Reg. ¶¶ 390, 391.

But this is academic. Both the DFW and FAA witnesses at the hearing testified that there would be an opportunity for Irving and its citizens to participate before a decision is made on the permanent use of runway 13L. After the tests end on August 9, the results will be analyzed. Recommendations will be made and the DFW Board will, after holding public hearings, make a proposal to the FAA concerning runway 13L (testimony of Jack Downey, DFW Deputy Executive Director). The FAA would then require the DFW Board, as the landlord of the airport, to make an environmental assessment; the FAA would either concur with this assessment or require additional data. Public hearings would be a part of this process, at which time the comments from Irving and its citizens would be considered in determining whether or not to approve the DFW proposal concerning runway 13L (testimony of C. R. Melugin, Jr., FAA Regional Director, and Richard Failor, Chief, Air Traffic Division, FAA Southwest Region). After the FAA decision is rendered, it will—as indicated above—be subject to court review. See *Strycker's Bay Neighborhood Council, Inc. v. Karlen, supra; Save Our Ten Acres v. Kreger, supra.*

The proposal by DFW to the FAA will probably not be completed until fall or winter of 1981. The FAA will probably not make its decision until spring of 1982. Therefore, although these dates are estimates, the tests on runway 13L will cease on August 9—and the north departure path along Highway 114 will resume and will be followed, at least until the spring of 1982.

*The Conclusions in the FONSI Were Not Unreasonable*

The FAA spent over one month in making the environmental assessment which lead to the "finding of no significant impact" (FONSI). Although this was the first FONSI done by this regional office, two environmental experts worked on it (along with others). The testimony of Richard Failor (Chief, FAA Air Traffic Division), who was in charge of the project, established:

... that the staff took existing data and projected new noise contours for alternative departure routes on runway 13L;

... that although these noise contours "were not perfect," they projected increased noise in the range of 65 to possibly 70 decibels (but did not show readings of 70–80 decibels);

... that various other factors besides the noise contours were considered in proposing the test (the character of the community, testing during the day instead of at night, the selection of a commercialized corridor down Beltline Road to minimize the noise impact, etc.);

... that no public hearings were held, but the FAA did consider the past history and the substantial disagreements with Irving concerning runway 13L when DFW opened.

Based upon these factors, the FAA proposed the limited 60-day test of runway 13L—and concluded in the FONSI that the test was not a major action which had a significant impact on the quality of the human environment. The ultimate basis of the FONSI is the temporary nature of the tests. Under these circumstances, and based upon the testimony at the temporary injunction hearing as well as the FAA record, the Court finds that the conclusions reached in the FONSI were not unreasonable.

In addition, all of the specific arguments made by the plaintiffs concerning the FONSI conclusions have been considered, but rejected. The major ones are these:

(i) *The administrative record* supporting the FONSI was adequate for court review. The FONSI need only be a concise document (FAA Reg. ¶ 300), and the Environmental Assessment adequately summarizes the support for its conclusions (FAA Reg. ¶ 331). In addition, the agency record was supplemented by testimony at the temporary injunction hearing which supported the FAA's decision that no EIS was required. See *Simmans v. Grant, supra; Sierra Club v. Hassell, supra.*

(ii) *The noise contours* done by the FAA projected increases in noise levels less than those which actually resulted from the tests on runway 13L (according to the testimony of the noise experts for the plaintiffs and the defendants). However, the fact that these subsequent studies show a higher noise level does not establish that the FONSI's conclusions were unreasonable. The difference was not as significant as the plaintiffs claim—some 65–70 decibels according to the noise contours, some 70–80 decibels according to the noise experts. Moreover, all of the experts agreed that the increased noise would have no immediate or long range effects on hearing or health *if the tests stop on August 9.* Under these circumstances, the Court cannot substitute its own judgment for that of the FAA that no significant noise impact would result from the temporary tests.

(iii) *The length of the test* was not unreasonable. Although there was conflicting testimony about whether the noise testing could be done in less than 60 days—plaintiffs' expert testified he could do it in 15 days, if weather conditions remained stable—this ignores the fact that the testing was for two reasons: to evaluate both the environmental affects *and* the operational aspects of the new departure route. Testimony was basically undisputed that the operational tests would require 60 days—30 days to allow for variations in weather conditions, delay factors, operational adjustments, and for air controllers to become proficient in the new procedures, and 30 days to collect the data.

(iv) *Testing by computer* could, according to the plaintiffs' expert (Dr. Alan Marsh), have been done for the noise and environmental studies, thus making it unnecessary to have any actual tests on runway 13L. This opinion was contrary to the testimony of the defendants' experts—and all of the experts agreed that actual tests for noise and environmental effects were more accurate than computer simulations. In addition, computer

studies could not accomplish the second purpose of the tests: the evaluation of the operational aspects of the new departure path. And even the plaintiffs' expert (Dr. Marsh) testified that this operational evaluation could not be done without actual tests.

Accordingly, the conclusions of the FAA in the FONSI—that actual tests were required for a period not to exceed 60 days, and that these temporary tests would not significantly affect the quality of the human environment—were not unreasonable. *Sierra Club v. Hassell, supra; Save the Bay, Inc. v. U. S. Corps of Engineers, supra.*

## No Violation of FAA Regulations

The plaintiffs also contend that the FONSI must be found unreasonable because the FAA failed to follow its own regulations in preparing the environmental assessment and the FONSI. Specifically, they allege that the FAA failed to (1) conduct an adequate preliminary review, FAA Reg. ¶¶ 201 and 202; (2) identify and evaluate alternatives, FAA Reg. ¶ 331(d); (3) consider community planning, FAA Reg. ¶ 331(e); and (4) consult the public or affected local governments, FAA Reg. ¶¶ 210 and 214.

The Court concludes that these regulations were not violated by the FAA. The environmental assessment, supplemented by the testimony of the FAA official who signed the FONSI (Richard Failor), established (1) that FAA staff members conducted the required preliminary review; (2) that alternatives were adequately identified and evaluated; and (3) that local community planning was adequately considered.

Of serious concern to this Court is the plaintiffs' fourth contention: that the FAA was required to consult with local officials and the public before issuing the FONSI. Irving officials were not contacted by the FAA or by DFW prior to the February 6, 1981 authorization of the test of the new south departure path on runway 13L. Furthermore, the public was neither advised nor afforded an opportunity to comment on the test or any alternatives to the airport's capacity problems.

However, FAA Reg. ¶ 210 does not *require* the agency to consult with local officials; rather, it directs that local officials *"should* be consulted" and that comments "shall be considered, *as appropriate."* Nor was the agency *required* to consult the public regarding the proposed test. FAA Reg. ¶ 214 provides:

"214. Citizen Involvement. Citizen involvement, *where appropriate,* should be initiated at the earliest practical time and continued throughout the development of the proposed project in order to obtain meaningful input.... Such citizen involvement *may be appropriate* in defining the scope of work of an environmental assessment developed by an applicant for aid or by a consultant, or of a DEIS [draft environmental impact statement] being developed by FAA. Comments from individuals and groups shall be considered in preparing an EIS or FONSI. A summary of citizen involvement and the environmental issues raised shall be documented *where practicable* in the EIS or FONSI." (Emphasis added.)

This provision is consistent with FAA Reg. ¶ 203 and CEQ Reg. § 1501.4(b), both of which provide that the public shall be involved "to the extent practicable, in preparing assessments." CEQ Reg. § 1506.6(c) states that public hearings or public meetings shall be held "whenever appropriate" or when required by statute, and FAA Reg. ¶ 213 specifies the criteria to be considered:

"213. Public Hearings.

a. The following elements are to be considered in deciding whether a public hearing is appropriate in cases where it is not statutorily mandated:

(1) The magnitude of the proposal in terms of environmental impact or controversy, economic costs, the size and location of the geographic area involved, and the uniqueness or amount of the resources to be committed;

(2) The degree of interest in the proposal, as evidenced by requests from the public or Federal, State, and local authorities that a hearing be held;

(3) The complexity of the issue and the likelihood that information presented at the hearing will be of assistance to the agency in fulfilling its responsibilities; and

(4) The extent to which public involvement already has been achieved through other means, such as earlier public hearings, meetings with citizen representatives, or written comments on the proposed action.

Under these regulations, the decision of whether local government officials should be consulted or a public hearing held—prior to the issuance of the FONSI—was within the discretion of the FAA.[24] The evidence at the temporary injunction hearing established that the FAA was fully aware of the history of citizen complaints regarding aircraft noise from runway 13L and of the views of Irving officials concerning increased use of the runway—and that the FAA determined that consultation with these groups would not provide additional meaningful information in the environmental assessment of the proposed test. The evidence also established:

"... that DFW did not have any ulterior motive in failing to notify Irving of its December 27, 1980 request to the FAA for a test of increased use of runway 13L (but wanted to wait until there was a "real" chance the FAA would approve the tests before contacting Irving);[25]

... that on the day after the FONSI was issued (February 7, 1981), DFW contacted Irving officials to arrange a meeting to discuss the tests on runway 13L, but this was postponed at the request of Irving until after the city elections;

... that DFW and FAA representatives did meet with Irving officials on May 1, 1981, over one month before the tests were scheduled to begin on runway 13L;

... that the volume and intensity of the citizen complaints came as a surprise to DFW and the FAA and, perhaps, even to Irving officials.[26]

... that there will be an opportunity for Irving and its citizens to participate before a decision is made on the permanent use of runway 13L (testimony of Jack Downey, DFW Deputy Executive Director; testimony of C. R. Melugin, FAA Regional Director)."

Under these circumstances, and because it was within the discretion of the agency to determine if local officials and the public should be consulted before the issuance of a FONSI, the Court concludes that the FAA's failure to consult with Irving or its citizens before February 6, 1981 (the date of the FONSI) did not violate FAA regulations.

*The "Commitment" to Irving*

Although this was not presented as a separate ground for relief, the plaintiffs also argued that the tests violated a "commitment" to Irving, or an "agreement" or "understanding" with Irving, by DFW and the FAA to use only the noise abatement departure for runway 13L specified in the original DFW Environmental Impact Statement. Testimony did establish that this "commitment" was the subject of meetings, correspondence, statements by FAA representatives, etc.

---

24. It has been held that, before its determination of the significance of a proposed action, an agency must give public notice of the proposed action and provide an opportunity for the submission of relevant facts. *Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908 (1973); on appeal following second remand, *Hanly v. Kleindienst*, 484 F.2d 448 (2d Cir. 1973), cert. denied, 416 U.S. 936 (1974). However, that case was decided before the promulgation of the CEQ regulations in their present form, and in its opinion the Court specifically noted the absence of statutory or administrative guidelines on the subject.

25. The note written on this letter by Jack Downey (DFW Deputy Executive Director) was prophetic indeed: "*[This] will raise a real controversy sooner or later, and I believe it should not be a surprise later to Irving*" (Pltf. Exh. 25).

26. The evidence at the temporary injunction hearing did not show what notice was given by Irving to its citizens during the one-month period from the May 1 meeting until the tests started on June 11, 1981.

Irving claims that it relied upon this "commitment" in community planning and in spending "thousands of dollars" in implementing and developing these plans. It argues that this "commitment" regarding runway 13L can never be changed.

In response, the defendants contend that the "commitment" in the EIS can be changed if proper procedures are followed under NEPA and FAA regulations—and that, indeed, the "commitment" must be changed because of conditions discussed at the beginning of this opinion ("The History of Runway 13L"). The defendants also argue that Irving cannot rely upon any so-called "commitment" because it rezoned some of the very property in question—from industrial/commercial to "residential or multi-family use"—in violation of its obligations under the "Mid-Cities Agreement."

The evidence concerning this "commitment" or "understanding" was not fully developed since the temporary injunction hearing was not a trial on the merits. The evidence, therefore, is not sufficient to entitle the plaintiffs to any injunctive relief—but this issue will, no doubt, be presented in subsequent proceedings before DFW and the FAA concerning the environmental impact statement and the use of runway 13L.

*No Right to Enjoin the Tests Has Been Established*

█ In order for the plaintiffs to obtain a preliminary injunction, they had the burden of proving:

(1) A substantial likelihood that they will prevail on the merits;

(2) A substantial threat that plaintiffs will suffer immediate and irreparable injury if the injunction is not granted;

(3) A threatened injury to plaintiffs which outweighs any substantial harm the injunction may cause to other parties; and

(4) The public interest would not be adversely affected by the preliminary injunction.

27. Even if the plaintiffs had proven a violation of NEPA or FAA regulations, this would not—of itself—establish the "irreparable injury" re-

*Canal Authority v. Callaway,* 489 F.2d 567, 575 (5th Cir. 1974); *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430 (5th Cir. 1981); *City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority,* 636 F.2d 1084 (5th Cir. 1981).

The plaintiffs have not met this burden. For reasons discussed above, they have not established a substantial likelihood they will prevail on the merits. Nor have they established any immediate and irreparable injury since the tests will end by August 9, 1981.[27]

As to the last two requirements for injunctive relief, the benefits the plaintiffs would derive from an injunction would not offset the costs to the national air traffic system and to the public generally, because the evidence established:

(i) that significant planning has gone into the planning and implementation of the 60-day test and flight arrivals and departures have been planned upon the basis of the test;

(ii) that disruption of the test in midstream will seriously affect the national air transit system, causing delays in a key airport in the center of the United States;

(iii) that the integrity of the test may be impaired if an injunction is granted, so that any new test would have to start over.

*The Defendants' Motions to Dismiss*

The defendants, including intervenor ATA, contend that this suit should be dismissed or stayed for three reasons. Their arguments are not correct, and the motions to dismiss are denied.

█ *Primary Jurisdiction* : The first contention is that this case should be dismissed or stayed because primary jurisdiction is vested in the FAA. *United States v. Western Pacific Railway Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The defendants argue that the FAA has primary jurisdiction over the plaintiffs claims—that

quired for the granting of an injunction. *Kleppe v. Sierra Club,* 427 U.S. 390, 408, 96 S.Ct. 2718, 2729, 49 L.Ed.2d 576 (1976).

the FAA violated NEPA by failing to file an EIS—because:

(i) The Supreme Court has specifically recognized that control of aircraft noise under the Federal Aviation Act necessitates a single federal scheme of regulation. *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); *Luedtke v. County of Milwaukee*, 521 F.2d 387 (7th Cir. 1975).

(ii) The FAA has special expertise in the area of aircraft noise—as evidenced by the Noise Control Act (49 U.S.C. § 4901), the Federal Aviation Act (49 U.S.C. § 1301), and the National Environmental Policy Act (42 U.S.C. § 4321)—statutes in which Congress has committed regulation of aircraft noise to the FAA. Neither of these traditional justifications for the doctrine of primary jurisdiction applies in this case. The question of whether an EIS is required under NEPA is a matter of law. It is not an administrative question requiring uniformity of decision and application; and, the FAA has no expertise or specialized knowledge in determining when an EIS is required under NEPA. Moreover, there are numerous cases in which courts have reviewed the FAA's failure to file an environmental impact statement. See *Virginians for Dulles v. Volpe*, 541 F.2d 442 (4th Cir. 1976); *Burbank Anti-Noise Group v. Goldschmidt*, 623 F.2d 115 (9th Cir. 1980).[28]

■ *Failure to Exhaust Administrative Remedies* : The second contention—that the case should be dismissed because of the failure of the plaintiffs to exhaust their administrative remedies before the FAA—is also incorrect. In *State of Illinois ex rel. Scott v. Butterfield*, 396 F.Supp. 632 (N.D. Ill.1975), the court first noted that there was no agency "order" subject to administrative review—and it also concluded that there simply were no "administrative remedies" for the failure of the FAA to prepare an EIS:

"We have also reviewed the F.A.A. and C.A.B. procedures for implementation of the National Environmental Policy Act of 1969. 39 Fed.Reg. 35231 (1974); 40 C.F.R. § 399.110. While these procedures have provisions for citizen involvement in preparation of the environmental impact statement, the procedures are deficient in providing for citizen views as to whether said statement is required in the first instance.

"Thus we conclude that plaintiffs have no additional avenues of relief to pursue, and the action does not fall for failure to exhaust administrative remedies."

■ *Exclusive Judicial Review* : The defendants' third claim is that plaintiffs' suit must be filed in the United States Courts of Appeal pursuant to the Federal Aviation Act, 49 U.S.C. § 1301, and that this action must be dismissed for lack of subject matter jurisdiction. The case relied upon for this proposition, *City of Rochester v. Bond*, 603 F.2d 927 (D.C.Cir.1979), is distinguishable for two reasons: First, it involved the review of an *order* under the FAA Act (that a radio tower presented "no hazard"), a determination subject to a special review statute—but NEPA, the statutory basis of this case, does not have any similar provision, and there is no "order" in this case. Second, *City of Rochester* involved the Commerce Act and the Aviation Act, where review is exclusive in the Court of Appeals; that decision did not purport to apply to cases where the *only* claim involved was under NEPA. In addition, the defendants' argument ignores the numerous cases listed above in which the FAA's decision not to issue an EIS was subject to judicial review by a federal district court.

An order will be entered in accordance with this Memorandum Opinion (i) denying the plaintiffs' request for a temporary injunction, and (ii) denying the defendants' motions to dismiss.

---

**28.** See also *Environmental Defense Fund, Inc. v. Adams*, 434 F.Supp. 403 (D.C.D.C.1977); *Citizens for Responsible Area Growth v. Adams*, 477 F.Supp. 994 (D.N.H.1979); *City of Boston v. Coleman*, 397 F.Supp. 698 (D.Mass.1975); *City of Romulus v. County of Wayne*, 392 F.Supp. 578 (E.D.Mich.1975); *State of Illinois ex rel. Scott v. Butterfield*, 396 F.Supp. 632 (N.D.Ill.1975).